2026 Tex. Bus. 15



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| DALLAS SPORTS GROUP, LLC AND RADICAL ARENA, LTD., *Plaintiffs* | § § § | |
| v. | § § | Cause No. 25-BC01B-0049 |
| DSE HOCKEY CLUB, L.P., et al. L.P., *Defendants* | § § § § | |

## OPINION AND ORDER ON COMBINED SUMMARY JUDGMENT MOTIONS

*Syllabus*[1]

*This opinion discusses contract construction principles applied to four separate but related contracts among three parties, executed over a one-year period. It also concerns the inconsistent conduct requirement for implied waiver by conduct necessary to overcome a contractual nonwaiver by conduct clause.*

## Opinion

Freedom of contract is a policy of individual self-determination; individuals can control their destiny and structure their business

---

[1] *This syllabus is for the reader's convenience; it is not part of the court's opinion; and it is not legal authority.*

interactions through agreements with other competent adults of equal bargaining power, absent violation of law or public policy.

*Shields Limited P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017) (citations omitted).

[¶ 1]  The Dallas Mavericks and Dallas Stars organizations co-own—fifty-fifty—a limited partnership (Center Operating Company, L.P., a Texas limited partnership (COC)) that contracted with the City of Dallas to operate the American Airlines Center where both teams play their home games.[2]  They also co-own—fifty-fifty—the partnership's general partner (Center GP, LLC, a Texas limited liability company).[3]  Between them, the parties filed, briefed, and argued seven summary judgment motions.

[¶ 2]  Their legal disputes concern (i) the Mavericks' claims that they redeemed the Stars' ownership interests in both entities, gained control of the arena's operations, and the Stars have since interfered with the Mavericks'

---

[2] Unless indicated otherwise, the court calls plaintiffs the Mavericks and defendants the Stars.

[3] Although the parties colloquially refer themselves as the "Mavericks" and the "Stars," there is no entity named the "Mavericks" or the "Stars" that is a partner under the COC Agreement or a member under the Center GP Agreement.

right to control the arena, and (ii) defenses the Stars asserted in their summary judgment motions and raised in response to the Mavericks' motions.[4]

## I. Preface

[¶ 3]  The essential facts are well-documented and undisputed.  There is no conflicting testimony here, there are only documents and legal consequences.  However, the parties disagree about those consequences.[5] That is, they dispute the proper application of existing law to undisputed facts.

[¶ 4]  Despite extensive briefing and arguments, this case distills to this pivotal issue: whether the parties' "Location Commitments" require that the "Teams'" principal, public-facing presence be in Dallas, Texas?

---

[4] After the parties filed their motions, responses, replies and two days before these motions were originally set for hearing, the Stars notified the Mavericks and the court that DSE Hockey Club, L.P. was not the correct successor to Stars' ownership interests in COC and Center GP.  The Stars amended each of their five motions and submitted a supplemental Brad Alberts declaration to correct his prior statements regarding the correct Stars successor entity in interest.  But the parties agree that those amendments and the supplemental Alberts declaration do not affect the parties' prior submissions.  *See* Stars' Response to Mavericks' Rule 37 Motion at 9; Mavericks' Response to Stars' Motion for Leave & Rule 37 Motion App. at 51–69.  So, the court decides these issues based on the amended motions and the supplemental Alberts declaration.  Nonetheless, the court granted the parties' motions for leave to add Dallas Sports & Entertainment, L.P. as a party to this case.  However, Dallas Sports & Entertainment, L.P. was not legally before the court when the parties argued their motions.

[5] Both sides asked the court to issue an opinion with its rulings.  *See* TEX. R. CIV. P . 360(a)(1).

[¶ 5]   As used in the Location Commitments, "Owner" and "Team" are defined terms, they mean different things, and the court must use those different meanings when analyzing the parties' arguments.  After applying the applicable law and contract construction rules to the undisputed facts, the court concludes as a matter of law that the Location Commitments have only one reasonable meaning: "Owners" are required to designate and maintain in Dallas the principal corporate and executive offices of their respective "Team," rather than the "Owner's" own such offices.  Further, the evidence conclusively establishes that at all relevant times the Mavericks have complied with this requirement—and the Stars have not.

[¶ 6]   Accordingly, for those and the additional reasons discussed below, the court denies the Stars' summary judgment motions and grants the Mavericks' declaratory judgment and affirmative defenses motions.[6]

---

[6] The court's order does not address and reserves for later determination whether these holdings also apply to Dallas Sports & Entertainment, L.P., which plaintiffs added as a party in an amended pleading on February 26, 2026, assuming it is the correct Stars owner.

[¶ 7] Nonetheless, these rulings do not dispose of the entire case because they do not address the Mavericks' tortious interference claim, which is set for trial on May 11, 2026, and other issues.[7]

## II. Background

[¶ 8] The ultimate issue is whether the "Mavericks" redeemed the "Stars'" ownership interests in COC and Center GP for a total of $110.00. Resolving that issue requires the court to construe four related contracts: (i) the Stars' Franchise Agreement with Dallas, (ii) the Mavericks' Franchise Agreement with Dallas, (iii) the COC limited partnership agreement (COC Agreement), and (iv) the Center GP company agreement (Center GP Agreement).[8] Those four contracts are part of an arrangement whereby Dallas issued bonds to finance the construction of the American Airlines Center

---

[7] The court requested supplemental briefing on March 10, 2026, concerning what notice was required to a Relocation Partner to redeem its interest. This issue goes to whether the Mavericks notified the correct party when they sent their redemption letter. The court does not decide that issue in this opinion and order.

[8] The Mavericks' tortious interference claim depends on the Mavericks' successful redemption of the Stars' partnership and membership interests. Thus, although the parties' motions do not necessarily independently address the Mavericks' tortious interference claims, those claims would evaporate if the Mavericks did not successfully redeem the Stars' ownership interests. But the Stars did not make that specific argument, so it is not properly before the court.

where the Mavericks and Stars play their home games pursuant to a lease between COC and Dallas.[9] That lease expires in 2031.[10]

[¶ 9] In 1998, the parties executed separate franchise agreements with Dallas. Each such agreement has a "Location Commitment" requiring that ". . . the Owner shall continuously designate the City as *the location* (a) in which the Home Games shall be played, and (b) in which the principal corporate and executive offices of the *Team* shall be maintained."[11] The Mavericks were not a party to the Stars' franchise agreement and vice versa.

[¶ 10] Effective as of roughly a year later, the parties executed their COC partnership and Center GP company agreements.[12] Both agreements (the Agreements) have "Relocation Events" clauses.[13]

[¶ 11] The Relocation Events clauses provide that if a Relocation Event occurs, (i) the partnership and a general partner may redeem the Relocation Partner's/Member's interests in that entity;[14] or (ii) a "Remaining

---

[9] *E.g.*, Stars' MSJ App., Vol. 1 at 12, 23.

[10] *See generally*, Stars' MSJ App., Vol. 1 at 77, 155-56.

[11] Stars' MSJ App., Vol. 1 at 14 (Stars' Franchise Agreement, § 2.1. (emphasis added)), 25 (Mavericks' Franchise Agreement, § 2.1) (emphasis added)).

[12] Stars' MSJ App., Vol. 1 at 37, 134.

[13] Stars' MSJ App., Vol. 1 at 77, 155-56.

[14] Stars' MSJ App., Vol. 1 at 77, 155-56.

Partner/Member" may cause such redemption.[15]  Either way, the redeeming party must pay the redeemed party $100 for the partnership interest and $10 for the general partner membership interest.[16]  Those amounts result from contractual reductions to the redeemed party's capital accounts.[17]

[¶ 12]  A Relocation Event occurs if before 2031 a party breaches its Location Commitment to Dallas.[18]

[¶ 13]  The Mavericks contend that the Stars became a Relocation Partner/Member no later than 2003 when they moved their administrative offices and practice facilities to Frisco, Texas.[19]

[¶ 14]  Conversely, the Stars contend that the Mavericks became a Relocation Partner/Member when (i) Dallas Basketball Limited (DBL) on November 15, 2024, identified a Las Vegas, Nevada address as its Principal Office and Principal Place of Business on a Texas Franchise Tax Public Information Report and (ii) in March 2025, Dallas Sports Group, LLC's (DSG)

---

[15] Stars' MSJ App., Vol. 1 at 77, 155-56.

[16] Stars' MSJ App., Vol. 1 at 77, 155-56.

[17] Stars' MSJ App., Vol. 1 at 77, 155-56.

[18] Stars' MSJ App., Vol. 1 at 77, 155-56.

[19] *See* Mavericks' First Amended Petition (FAP) ¶s 44, 48; Mavericks' MSJ App. Vol 1 at 7.

Texas Application for Registration of a Foreign Limited Liability Company identified that its principal office address and that of its governing person (Patrick Dumont) are in Las Vegas, Nevada.[20]

[¶ 15]  On October 25, 2024, the Mavericks' counsel delivered a letter to the Stars' counsel stating that a Stars' Relocation Event had occurred and the Mavericks were thereby causing COC and Center GP to redeem the Stars' entire interests in those entities.[21]  The Mavericks simultaneously tendered $100 and $10 in cash, respectively, per the Agreements.[22]

[¶ 16]  Six days later, the Stars rejected the Mavericks' purported redemptions.[23]

[¶ 17]  During the summer of 2025, the Mavericks, Stars, and Dallas were discussing plans for after the arena lease' expiration.[24]  Those discussions reached a boil, and *Dallas* sent the Stars an October 3, 2025, letter discussing the Stars' Location Commitment default.[25]

---

[20] Stars' Am. Answer (SAA) ¶s 4-9.

[21] Mavericks' MSJ App. at 201-02.

[22] Mavericks' MSJ App. at 201-02.

[23] DSE Hockey Club, L.P.'s First Amended Counterclaim (Stars FAC) at 12-13 and Exhibit D; DSE Hockey Club's Second Amended Counterclaim at 12 and Exhibit D.

[24] Mavericks' MSJ App. at 206-09.

[25] Mavericks' MSJ App. at 208.

[¶ 18]  The Mavericks sued three weeks later, asserting two counts. First, they requested a declaratory judgment that (i) they caused an October 25, 2024, redemption of the Stars' COC and Center GP ownership interests; (ii) the Mavericks became both entities' sole owner; (iii) the Stars' Center GP board members are deemed to have resigned; and (iv) the Mavericks have sole authority to designate their replacements.[26]

[¶ 19]  Second, they pled a tortious interference claim asserting that the Stars' refusal to acknowledge the redemptions, and the termination of the Stars' board positions, tortiously interferes with the Mavericks' contract right to approve necessary arena expenditures.[27]  Finally, they seek injunctive relief to prevent the Stars from interfering with those rights.[28]

[¶ 20]  The Stars answered, pled affirmative defenses, and asserted a declaratory judgment counterclaim that, on a granular level, seeks the opposite of what the Mavericks requested.[29]

---

[26] *See* Mavericks' Original Pet., ¶s 68-75.

[27] Mavericks' Original Pet., *passim*.

[28] Mavericks Original Pet. ¶ 96.  They have amended their petition, but the essence is the same.

[29] *See generally* Stars' Second Amended Answer at 2-7.

### III. The Parties' Cross-Summary Judgment Motions

[¶ 21]   The Stars filed five traditional summary judgment motions, and the Mavericks filed two such motions.

[¶ 22]   The Stars' motions address whether:

(i) the COC and Center GP entities, as opposed to the Mavericks, are the only proper parties capable of redeeming the Stars' ownership interests;

(ii) the Mavericks' designations of Las Vegas as the principal offices for certain Mavericks corporate entities prevent the Mavericks from asserting their claimed redemption rights as a Remaining Partner;

(iii)  limitations bar the Mavericks' "breach" cause of action;

(iv) the fact that the Stars were not located in Dallas when the parties signed the partnership and LLC agreements defeats the Mavericks' claims based on the original impossibility doctrine; and

(v) the Mavericks waived their claims by knowing the Stars' location for more than twenty years without exercising redemption rights.

[¶ 23]   The Mavericks' motions address whether:

(i) they effectively caused a redemption of the Stars' COC and Center GP interests;

(ii) the Stars' board members were terminated from the Center GP board;

(iii) the parties' nonwaiver clauses bar claims that the Mavericks delayed in exercising their redemption rights; and

(iv) laches is a defense to their claims.

[¶ 24]  On the Saturday before the original setting for these motions, the Stars announced that, despite their contrary allegations, arguments, and submitted evidence, DSE Hockey Club, L.P. was not the actual successor to the Stars' contracting party and the Mavericks sued the wrong party.  Both sides later filed motions to add Dallas Sports & Entertainment, L.P. (DSELP) to the case as the ostensible Stars' successor in interest.  The Stars also filed amended summary judgment motions changing only the phrase "Stars' interests" to "Stars' purported interest."[30]

[¶ 25]  During a February 26, 2026, status conference, the parties agreed that adding DSELP would not affect the pending summary judgment motions or the upcoming hearing on those motions.

[¶ 26]  On March 6, 2026, the court heard oral arguments regarding all seven motions.  The court then considered the parties' motions, responses, replies, evidence, and objections.  By separate order, the court ruled on the parties' objections to the summary judgment evidence.

---

[30]  *Compare, e.g.*, Stars' Original Impossibility MSJ ¶ 2 *with* Stars' Original Impossibility Amended MSJ ¶ 2.

**IV. Applicable Standards**

**A.    Summary Judgment Standards**

[¶ 27]  A party may move with or without supporting evidence for summary judgment as to all, or any part of any, causes of action or defenses.[31] TEX. R. CIV. P. 166a(a), (b).  The motion must state its specific grounds.  *Id.* at 166a(c).

[¶ 28]  The court *shall* then render judgment if the pleadings, summary judgment filings, and properly filed evidence show that, except as to the amount of damages, there is no *genuine* issue as to any *material* fact and the movant is entitled to judgment as a matter of law on the issues stated in the motion or in an answer or any other response.  *Id.*; *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

[¶ 29]  So, a summary judgment motion

> … is essentially a motion for a pretrial directed verdict. * * * Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. * * * [Courts] review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable

---

[31] Texas Supreme Court Miscellaneous Order No. 26-9012 adopted amendments to Rule 166a.  The prior Rule 166a applies to these motions because the parties filed them before the Rule amendments became effective.  However, the changes would have no effect on the motions or the court's rulings.

jurors could, and disregarding contrary evidence unless reasonable jurors could not. * * *

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581-82 (Tex. 2006) (citations omitted).

[¶ 30]  A genuine fact issue exists if more than a scintilla of evidence supports the alleged fact.  *See Amazon.com Servs. LLC v. Grant*, No. 05-23-01306, 2024 WL 5053063, at *2 (Tex. App.—5th Dist. Dec. 10, 2024, no pet.).

[¶ 31]  Evidence is more than a scintilla when it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.3d 706, 711 (Tex. 1997)).  However, less than a scintilla exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact.  *King Ranch*, 118 S.W.3d at 755 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

[¶ 32]  When contract terms are unambiguous and the *material* facts are undisputed, compliance with those terms is a question of law.  *Hrdy v. Second St. Props.*, 649 S.W.3d 522, 554 (Tex. App.—1st Dist. 2022, pet. denied).

[¶ 33]  Thus, to decide these motions the court must apply contract construction principles to the parties' contracts.

## B.    Contract Construction

[¶ 34]  A court's primary objective when construing contracts "is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018)); *accord Equinor Energy LP v. Lindale Pipeline, LLC*, ___S.W.3d ___ 2026 WL 705761, *2 (Tex. March 13, 2026).

[¶ 35]  Usually, courts deem the contract alone to express the parties' intent because it is objective, not subjective, intent that controls. *Polyco*, 681 S.W.3d at 387.

[¶ 36]  Contract terms must be sufficiently definite so that a court can understand the parties' rights and obligations. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966).

[¶ 37]  With unambiguous contracts, courts "can determine the parties' rights and obligations under the agreement as a matter of law." *Inwood Nat'l Bank v. Fagin*, No. 24-0055, 2025 WL 349890, at *4 (Tex. 2025) (per curiam)

(quoting *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)); *accord Equinor Energy*, 2026 WL 705761, *2.

[¶ 38]   A written contract is unambiguous if it is so worded that it can be given a definite or certain meaning when considered in context of the circumstances surrounding its execution and as applied to the matter in dispute.[32]  *URI*, 543 S.W.3d at 765.

[¶ 39]   Context is a permissible indicator of meaning, and courts are to harmonize and give effect to all contract terms by analyzing them regarding the whole contract.  *Polyco*, 681 S.W.3d at 390.

[¶ 40]   Appropriate context includes the circumstances that existed when the parties made their contract:

> Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered.  This is so because words are the skin of a living thought and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

---

[32] An ambiguity arises when an agreement is susceptible to more than one reasonable meaning after applying established rules of construction.  *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999).

*Board of Regents of the Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 443 (Tex. 2024) (per curiam) (quoting *URI, Inc.*, 543 S.W.3d at 764). Stated differently, context includes the business context and realities the words are meant to address. *Board of Regents*, 691 S.W.3d at 445.

[¶ 41]  Where contracts contain language of doubtful meaning, the court's primary concern is to ascertain and to give effect to the parties' true intention.  *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157-58 (Tex. 1951).  To that end, courts will examine and consider the entire writing, seeking as best they can to harmonize and give effect to all its provisions so that none will be rendered meaningless.  *Id.*

[¶ 42]  But contract terms need not be perfectly clear to be enforced if the court can discern the parties' objective intent from the words they chose. *Board of Regents*, 691 S.W.3d at 443-44.  Thus, courts apply a dominant intent rule if only one proffered interpretation is reasonable:

> Contractual text is not ambiguous *in a legal sense* merely because it is unclear and certainly not because the parties disagree about how to interpret it.  The latter is irrelevant; after all, issues of intent and proper interpretation arise only when there is disagreement.  Disagreement over the meaning of a contract does not mean that it is ambiguous, legally.  Lack of clarity is commonplace.  Not every unclear text is legally ambiguous.  Despite the deficits inherent in the use of language, '[w]henever

possible, courts must assess adverse arguments and resolve a text's meaning as a matter of law.'

*Id.* at 443 (footnotes and citations omitted) (emphasis in original).

[¶ 43] Thus, courts "must decide whether the meaning of the text read in context is genuinely uncertain or whether one reasonable meaning clearly emerges." *Id.* at 443-44.

[¶ 44] Because the COC and Center GP Agreements include redemption opportunities, the court should give the relevant contract terms meaning, if possible. *Id.* And the court should construe them in a way to avoid absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008).

[¶ 45] The court concludes that the parties' contracts have only one reasonable meaning regarding the Location Commitments, redemption clauses, the nonwaiver clauses, and their collective relationships.

## V. The Stars' "Standing" Motion

### A. Introduction

[¶ 46] The Stars' "Standing Motion" posits that:

1. This motion will require the Court to determine whether the Mavericks can properly redeem interests in a partnership and limited liability company without complying with the express procedures of the partnership and membership agreements.

2. Texas law recognizes and protects broad freedom of contract and obliges courts to enforce the parties' bargain according to its

express terms. In the present case, based on the Mavericks' failure to comply with the terms of the partnership and membership agreements, the Court should find that no redemption occurred. Accordingly, the Court should Grant this Motion for Summary Judgment.[33]

[¶ 47] To that end, the Stars argued that the Mavericks' redemption letter is ineffective because: (i) the agreements do not permit unilateral redemptions by one of the parties; (ii) only COC and Center GP, and not the Mavericks as a partner/member, can redeem the Stars' interests; and (iii) the Mavericks did not address their letter to the partnership or general partner.[34]

[¶ 48] The Mavericks responded that (i) the redemption clauses provide redemption rights to the redeeming partner and member; (ii) those clauses permit a redeeming party to "cause" the redemption; (iii) the partnership and membership agreements permit redemptions to avoid deadlock and futility; (iv) the Mavericks' letter combined with the contracts' terms satisfies the ordinary meaning of "cause"; and (v) whether the

---

[33] Stars' Standing MSJ at 1-2.

[34] Stars' Standing MSJ at 1.

Mavericks are third-party beneficiaries of the Stars' franchise agreement is irrelevant.[35]

[¶ 49] Although the Stars purport to challenge the Mavericks' "standing," their motion turns on contract rights under the COC and Center GP Agreements to which the Mavericks are parties and on which they stake their claims.[36] So, the Stars' Standing Motion presents only contract law issues instead of constitutional standing or legal capacity to sue.[37]

---

[35] The Mavericks' response also addressed constitutional standing. The court concludes that whether the Mavericks are intended third-party beneficiaries is not relevant and does not specifically address that issue.

[36] *See* the Mavericks' Original and First Amended Petitions, *in passim*. The Stars' Standing MSJ did not specifically mention lack of capacity to sue as a ground, the Stars' answer raised a lack of capacity defense (Stars' Original and First Amended Answers), and their oral argument acknowledged that lack of capacity was a proper characterization of their argument (Mar. 6, 2026, Tr. at 52:11-53:14).

[37] The supreme court has held that usually "the question whether a claim brought by a partner actually belongs to the partnership is [] a matter of capacity because it is a challenge to the partner's legal authority to bring the suit," and not a question of standing. *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 779 (Tex. 2020). Accordingly, the Mavericks have constitutional standing since they assert a concrete injury to themselves and a real controversy between the parties that the court will resolve. *Meyers v. JDC Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). Likewise, as a contracting party asserting its rights at issue, the Mavericks have legal capacity to assert their claims. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848-49 (Tex. 2005). So, the court denies the Stars' Standing Motion to the extent it challenges the Mavericks' constitutional standing or legal capacity to assert their claims.

## B. Analysis

### 1. Introduction

[¶ 50]  Texas law recognizes redemption clauses are normal vehicles that closely held entity owners may adopt to break deadlocks.  *Dunster Live, LLC v. LoneStar Logos Mgmt. Co.*, No. 03-22-00014-CV, 2024 WL 291403, *5 (Tex. App.—3d Dist. January 26, 2024, no pet.) (mem. op.).  Here, the parties' Agreements created a redemption opportunity that the court must enforce if the facts and law warrant.  *Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157-58.  And, if possible, the court is to construe the contracts to avoid an absurd result.  *City of Rockwall*, 246 S.W.3d at 626.

### 2. The Agreements contemplate at least two redemption paths.

#### a.  The Stars' Arguments

[¶ 51]  The Stars argued that "[p]ursuant to the express terms of the [partnership and membership] Agreements, *only* COC Partnership or Center GP may effectuate redemption, and no individual member may do so."[38]  But they do not explain how the Mavericks could accomplish that corporate action where there is a fifty-fifty deadlock.  So, the logical extension of the Stars'

---

[38] Stars' Standing MSJ at 2. (footnote omitted) (citing Stars' MSJ App., Vol. 1 at 77, 155-156 (emphasis added)).

argument is that the Mavericks could never redeem the Stars' ownership interests over the Stars' objection—despite express contract clauses giving the Mavericks that right under certain conditions.

[¶ 52] At oral argument, the Stars argued that the Mavericks should have called for a formal board vote.[39] But that argument does not explain how that vote would have broken a deadlock.[40] Nor did they offer any evidence that they would have capitulated had the Mavericks called for that vote.

[¶ 53] The only contract terms the Stars cited to support its argument that only the partnership/general partner could redeem was "Relocation Event" in COC Agreement § 4.8 and Center GP Agreement § 4.5.[41]

[¶ 54] COC Agreement §4.8 states:

> (a) If a Relocation Event occurs for any reason, then the Partnership may purchase and redeem the entire Partnership Interest of the Relocation Partners for an aggregate amount equal to $100. Any Partner that is not a Relocation Partner (referred to herein as a "Remaining Partner") may cause the partnership to so purchase and redeem the Partnership Interests of the Relocation Partners. After any such purchase and redemption, the Partnership Interests of the Relocation Partners shall be considered terminated, and no additional distributions or payments shall be required or made with respect to such

---

[39] Mar. 6, 2026, Tr. at 54:9-57:20, 89:20-90:11.

[40] *See* Mavericks' Declaratory Judgment MSJ at 44-45.

[41] Stars' Standing MSJ at 8.

redeemed Partnership Interests (including, without limitation, if applicable, any additional payments or distributions with respect to the ADS Loan and/or ADS Note).

(b) The Partners further agree that in connection with any such Relocation Event, the Partnership will recognize a built-in loss equal to the amount by which the aggregate Capital Account balances of the Relocation Partners at the time of such redemption exceed $100 (the aggregate redemption price). Notwithstanding anything to the contrary in this Agreement, this built-in loss shall be specifically allocated to the Relocation Partners in connection with the redemption of their Partnership Interests in a manner that reduces their aggregate Capital Account balances to $100.

(c) For Purposes of this Agreement, a "Relocation Event" means: (1) with respect to [the Mavericks], a breach by [the Mavericks] prior to the 30th anniversary of the Opening Date of: (A) . . .; or (B) section 2.1, section 2.2, and/or section 2.3 of the Mavericks' Franchise Agreement; and (ii) with respect to the Dallas Stars, a breach by the Stars prior to the 30th anniversary of the Opening Date of: (A) . . . ; or (B) section 2.1, section 2.2, and/or section 2.3 of the Stars Franchise Agreement.

(d) For purposes of this Agreement, the "Relocation Partners" means the Limited Partners that are Affiliates of the Team that cause the Relocation Event to occur.[42]

[¶ 55]   And COC Agreement § 4.5 states:

(a) If a Relocation Event occurs for any reason, then the Company may purchase and redeem the entire Partnership Interest of the Relocation Members for an aggregate amount equal to $10.  Any Remaining Member may cause the Company to so purchase and redeem the Company Interests of the Relocation Members.  After any such purchase and redemption, the Company Interests of the

---

[42] Stars' MSJ App., Vol. 1 at 77.

Relocation Members shall be considered terminated, and no additional distributions or payments shall be required or be made with respect to such redeemed Company Interest (including, without limitation, if applicable, any additional payments or distributions with respect to the ADS Loan and/or the ADS Note).

(b) The Members further acknowledge and agree that in connection with any such Relocation Event, the Company will probably recognize a built-in loss equal to the amount by which the aggregate Capital Account balances of the Relocation Members at the time of such redemption exceed $10 (the aggregate redemption price). Notwithstanding anything to the contrary in this Agreement, any such built-in loss shall be specially allocated to the Relocation Members in connection with the redemption of their Company Interests in a manner that reduces their aggregate Capital Account balances to $10.[43]

[¶ 56] However, those provisions do not specify any particular procedures or methods a redeeming party must follow to *cause* redemptions.[44] Nor do §§ 4.8(a) or 4.5(a) contain the word "only."[45] And the Stars did not argue any reason or adduce evidence showing that the Mavericks' redemption letter was an unreasonable, alternative method for causing the redemptions.

---

[43] Stars' MSJ App., Vol. 1 at 155-56.

[44] *See* Stars' MSJ App., Vol. 1 at 77, 155-156.

[45] *See* Stars' MSJ App., Vol. 1 at 77, 155-156.

[¶ 57]   Thus, the Stars ask the court to add "only" to those sections so that a formal entity action is the only way a redeeming party can accomplish a redemption:

> The Redemption provisions contained in the Agreements expressly state that only the COC Partnership or Center GP may effectuate a redemption after a relocation event.[46]

But the word "only" is not in the operative contract terms, and the court may not add it to them.  *See URI*, 543 S.W.3d at 767, 770.

[¶ 58]   Nonetheless, the Stars offered circular reasoning to address their conundrum.[47]  Specifically, they urged that no deadlock could occur because partnerships and LLCs are bound by their partnership and company agreements and the entities can then force the redemptions.[48]

[¶ 59]   But entities can only act through a governing body, which was split fifty-fifty here.  *See City of Denton v. Grim*, 694 S.W.3d 210, 216 (Tex. 2024) (corporations cannot act without human agents).  Thus, the Stars' "entity-only" argument offers no solution to a deadlock blocking a successful corporate vote to effect the redemptions.

---

[46] *See* Stars' Standing MSJ at 8.

[47] Stars' Standing MSJ Reply at 6.

[48] Stars' Standing MSJ Reply at 6; *see* TEX. BUS. ORG. CODE §§ 101.052 and 154.105.

[¶ 60]   The Stars also point to COC Agreement § 4.8(b) and Center GP Agreement §4.5(b), which require the partnership and the general partners to reduce the non-redeeming party's capital accounts to $100 and $10, respectively, as part of the redemption process to support the Stars' argument that only the entities themselves can accomplish the redemptions.[49]  However, the contracts make those adjustments automatic and render their recording ministerial.[50]  Thus, no formal corporate actions were needed to cause those capital adjustments.

### b. The Mavericks' Arguments

[¶ 61]   On the other hand, the Mavericks asked the court to construe the §§ 4.5 and 4.8 redemption clauses in their entirety and in context with their purpose, which is to provide a means for the fifty-fifty partners to break a deadlock regarding the right to redeem the other side's ownership interests and management rights.[51]

[¶ 62]   Specifically, they argue that the second sentences in §§ 4.8(a) and 4.5(a) providing that a Remaining Partner/Member *may cause* the entity

---

[49] Stars' Standing MSJ at 2-3, 8.

[50] Stars' MSJ App., Vol 1., App. at 77, 156; *see* discussion in part X(H) below.

[51] Mavericks' Standing MSJ Response at 21-25.

to redeem the Relocating Partner/Member's ownership interests give them the ability to cause the redemptions without a formal vote.[52]

[¶ 63]  Furthermore, the Mavericks argue that forcing a redemption vote would have been futile because (i) the general partner's voting power is split 50-50; (ii) those agreements permit the Mavericks to cause the redemption through a declaratory judgment action; and (iii) their letter and declaratory judgment action are viable means for causing the redemptions.[53]

### c. Decision

[¶ 64]  The court agrees with the Mavericks for several reasons.  To begin, the first sentence of COC Agreement § 4.8(a) contemplates direct action by the fifty-fifty split partnership, which, in turn, would require a vote of the fifty-fifty split general partner's board, to effect a redemption.[54]  Center GP Agreement § 4.5(a) is the same.[55]  Thus, a Stars' blocking vote would produce a deadlock preventing the redemptions.  Therefore, it was reasonable for the parties to provide an alternative redemption method.

---

[52] *See* Mavericks' Standing MSJ Response at 24.

[53] *See* Mavericks' Standing MSJ Response at 21–25.

[54] Stars' Standing MSJ App. at 77.

[55] Stars' Standing MSJ App. at 155-56.

[¶ 65]   Next, the second sentences of §§ 4.8(a) and 4.5(a) exist and the court is to give them meaning.  *See, e.g.*, *Universal C.I.T Credit Corp.*, 243 S.W.2d at 157-58.  To avoid deadlock, those sentences present a second redemption path that contemplates a redeeming party's indirect action that causes the redemptions.  If the Stars were correct that "only" the entities could cause the redemptions, the second sentences would be meaningless.  *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (courts give effect to all contractual provisions so that none will be rendered meaningless).

[¶ 66]   Furthermore, accepting the Stars' arguments would lead to the absurd result that the Agreements give the Mavericks the right to cause the redemption without the Stars' consent and simultaneously give the Stars the power to block the Mavericks from exercising their redemption rights.  So, as a matter of contract construction, the Mavericks could have but were not required to use a direct corporate vote to accomplish the redemptions.[56]

---

[56] Footnote one on page one of the Stars' "Mavericks' Relocation Event" motion says "[a]ccordingly, only the City has the legal right to claim that the Stars breached the [Stars'] Franchise Agreement."  To the extent the Stars make that statement as part of a standing or capacity argument, the court rejects that argument because the Mavericks' declaratory judgment claim does not rest on a premise that a Stars' Location Commitment breach with Dallas also breaches a Stars' contract with the Mavericks.  That follows because the Mavericks are not a party to that franchise agreement.  Rather, their claim is

[¶ 67]   Additionally, the ordinary meaning of "Redeem" includes "to exchange for money or goods" and "to buy."[57]  That is the path the Mavericks implemented when they delivered their redemption letter and tendered the redemption price in exchange for the Stars' COC and Center GP ownership interests.

[¶ 68]   Moreover, the Stars did not argue or adduce any evidence that requiring the Mavericks to go through the formal steps of calling a board vote would have been anything but a vain, useless, or futile act to accomplish the redemptions—that is, that calling a board vote would have produced a different result.[58]  But "[t]he law does not require the doing of a vain and useless thing[.]"  *Mackey v. Lucy Prods. Corp.*, 239 S.W.2d 607, 608 (Tex. 1951); *McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 526 (Tex. App.—8th Dist. 2020, no pet.) (quoting *Mackey*).  Similarly, Texas law does

that the Stars' Location Commitment breach with Dallas is instead a condition in the Stars'-Mavericks' COC and Center GP Agreements that triggers the Mavericks' claimed redemption rights.

[57]  Redeem, Dictionary.com (last visited March 29, 2026).

[58]  Additionally, Texas law contemplates partners or members in closely held partnerships or LLCs acting in their own name to assert their entities' rights. *See generally*, TEX. BUS. ORG. CODE §§ 101.463 and 153.413 (permitting derivative actions to treated as direct actions and providing direct recoveries in suits involving closely held limited liability companies and limited partnerships).

not require contracting parties to engage in futile acts. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594-95 (Tex. 2008) (law does not require parties to perform futile acts to enforce contract rights).[59]

[¶ 69]  Accordingly, the court denies the Stars' Standing Motion.[60]

### VI. The Stars' "Mavericks' Relocation Event" MSJ

#### A.    Introduction

[¶ 70]  The Stars rely on government filings by Mavericks affiliates to argue that the Mavericks' redemption efforts fail because the Mavericks are not "Remaining Partners/Members" capable of redeeming the Stars'

---

[59] Center GP Agreement § 7.2(e) (stripping a Relocating Partner's members from the general partnership board) does not change the result because the Stars either did not or would not have recognized its effect given that they refused to recognize the legitimacy of the redemption provisions.

[60] The Stars' original briefing did not cite COC Agreement § 1.7 to support their argument.  Section 1.7 provides that "[n]o partner acting alone, shall have any authority to act for, or to undertake or assume any obligation, debt, duty, or responsibility on behalf of any other Partner or the partnership except as otherwise expressly provided in this Agreement."  Stars' MSJ App., Vol. 1 at 38.  They invoked § 1.7 for the first time in response to the court's request for supplemental briefing.  *See* Stars' Supplemental Brief at 5-6.  Nonetheless, the court concludes that this provision does not affect the result for two reasons.  First, after considering the words taken as a whole and applying the *noscitur a sociis* principle, this clause refers to acts with third parties and not partners among themselves.  *See Primexx Energy Opp. Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶ 70, 709 S.W.3d 619, 638 (1st Div., appeal pending) ("[A] word or phrase's meaning, especially one in a list, should be known by the words immediately surrounding it.").  Second, even if the clause applied to actions between the partners, (i) this clause excludes exceptions provided for elsewhere in the agreement and (ii) as discussed in part V, the redemption clauses are an exception that permits one partner to cause the redemption of the other partners'/members' interests without a formal action.

interests.[61] According to the Stars, "the Mavericks changed the designated location of their principal office (that is, the 'place of business for day to day operations') to Las Vegas in 2024, [thus] they are neither Remaining Partners nor Remaining Members under the Agreements, and therefore have no right to purchase or redeem based on any Relocation Event."[62]

[¶ 71] The Mavericks responded that (i) the "Team's" principal corporate and executive offices have always been located in Dallas and (ii) governmental statements regarding their "Owner's" principal and corporate and executive offices do not defeat their redemptions.[63]

[¶ 72] The court denies the Stars' motion because (i) the franchise agreements distinguish between "Owners" and "Teams"; (ii) the "Location Commitment" clauses provide that the Owners must designate Dallas as the location of the "Team's"—not the "Owner's"—principal corporate and executive offices; (iii) the Location Commitments' word "location" indicates the parties' agreements with Dallas focused on the "Team's" visible presence in Dallas; (iv) the ordinary meaning of "designate" includes conduct that

---

[61] Stars' Mavericks' Relocation Event MSJ at 5-6.

[62] Stars' Mavericks' Relocation Event MSJ at 2-3.

[63] Mavericks' Relocation Event MSJ Response at 5.

indicates or sets apart an object; (v) the documents on which the Stars rely refer to corporate entities, not the Team; (vi) the Mavericks adduced that they at all relevant times physically designated and maintained the "Team's" principal corporate and executive offices in Dallas.[64]

## B. Analysis

### 1. Defined Terms

[¶ 73]  The analysis starts with the franchise agreements' "Location Commitments" and their defined terms.  Both agreements include this Location Commitment:

> Section 2.1. <u>Location Commitment</u>.  Subject to the rights of termination set forth in Section 2.5, and to the exculpatory provisions set forth in Section 2.3, throughout the Term, the Owner shall continuously designate the City as the location (a) in which the Home Games shall be played, and (b) in which the principal corporate and executive office of the Team shall be maintained.[65]

Absent a limiting clause, headings and titles provide context and can inform the meaning of sections they label. *Jones Constr. Grp. LLC v. Westlake Chem. Corp.,* 650 S.W.3d 392, 416 (Tex. 2022).  The caption "Location

---

[64] Appendix in Support of Plaintiffs' Responses to Motions for Summary Judgment (Mavericks' MSJ App.) at 30-38 (Lewis Dec.).

[65] Stars' MSJ App., Vol. 1 at 14, 25.

Commitment" together with the clauses' terms suggest a commitment to a physical location.

[¶ 74]  Next the Stars' franchise agreement defines "Owner" as the "Dallas Stars, L.P. and any successor in interest to the ownership rights in the Franchise and the Team including a purchaser or mortgagee (that acquires such rights by foreclosure or otherwise) of such ownership rights."[66]  The Mavericks' agreement is identical except it substitutes "Dallas Basketball Limited" for "Dallas Stars, L.P."[67]

[¶ 75]  Similarly, the Stars' agreement defines "Team" as "collectively, the players, coaches, trainers and administrative employees who represent the Franchise from time to time in competitive ice hockey games in the League, known as the 'Dallas Stars.'"[68] The Mavericks' agreement is identical, except it substitutes basketball for ice hockey and "Dallas Mavericks" for the "Dallas Stars."[69] Accordingly, "Team" is not defined based on particular legal

---

[66] Stars' MSJ App., Vol. 1 at 13.

[67] Stars' MSJ App., Vol. 1 at 25.

[68] Stars' MSJ App., Vol. 1 at 14.

[69] Stars' MSJ App., Vol. 1 at 25.

entities, but instead what the public knows and understands as the "Dallas Stars" and "Dallas Mavericks."

[¶ 76] Finally, both agreements define "Franchise" as "the rights of the Owner that were issued, granted, and sanctioned to the Owner by the League (as defined herein) authorizing the Owner to field and operate the Team as competing member of the League."[70]

[¶ 77] Thus, the franchise agreements mean that the Owners and their Teams are to be considered separately. And in context the word "location" refers to and is modified by both where the Teams play their Home Games (the Arena) and where their players, coaches, trainers, and administrative employees are located. Had Dallas and each organization, respectively, agreed that "location" was intended to mean where the Teams played home games and their Owners had their principal offices, that is what the Location Commitments would have said. But instead, they put the location emphasis on where the Teams played their home games and where the Teams maintained their principal offices.

---

[70] Stars' MSJ App., Vol. 1 at 13, 24.

## 2. The Parties' Location Evidence

### a. The Stars' Evidence

[¶ 78]   The Stars base their "Mavericks' Relocation Event" evidence on two government filings certain Mavericks affiliates made after the Mavericks delivered their October 25, 2024, redemption letter.  First, the Stars cite a November 15, 2024, Texas Franchise Tax Public Information Report filed by DBL.[71]  That document states that DBL's Principal Office and Principal Place of Business are in Las Vegas, Nevada.[72]  It also states that (i) DBL's general partner, Dallas Sports Group Management, LLC and (ii) a subsidiary (EMAVS LLC) and a parent entity (Radical Mavericks II, LTD) identify Texas as their state of formation.[73]

[¶ 79]   Second, the Stars cite a March 18, 2025, Application for Registration of a Foreign Limited Liability Company filed by DSG.[74]  That document states that DSG's principal office address is in Las Vegas, Nevada.[75]

---

[71] Stars' Mavericks Relocation Event MSJ at 9-10; Stars' MSJ App., Vol. 2 at 515 (1015).

[72] Stars' MSJ App., Vol. 2 at 515 (1015).

[73] Stars' MSJ App., Vol. 2 at 515 (1015).

[74] Stars' Mavericks Relocation Event MSJ at 11-12; Stars' MSJ App., Vol. 2 at 516-517 (1016-1017).

[75] Stars' MSJ App., Vol. 2 at 516 (1016).

It also identifies Patrick Dumont and Steven Garfinkel as DSG's governing persons with the same Las Vegas, Nevada address.[76]

[¶ 80]   Neither document says anything about where the Team plays its home games or where its players, coaches, trainers, and administrative employees are located.

[¶ 81]   The Stars also included a Texas Franchise Tax Public Information Report stating that as of November 2, 2023—before the redemption letter was sent—DBL and Radical Mavericks Management listed 1229 Slocum Street, Dallas, Texas 75207 as their office and principal place of business.[77]   So, if such filings were relevant, the Stars' evidence would locate the Mavericks in Dallas when they exercised their redemption rights.

b. **The Mavericks' Evidence**

[¶ 82]   The Mavericks submitted a declaration from Sekou Lewis, who stated he is, and since July 2018 has been, "the General Counsel and Chief Ethics Officer for the Dallas Mavericks."[78]   He also said that throughout his employment (i) his and the Dallas Mavericks' CEO and CFO's offices have

---

[76] Stars' MSJ App., Vol. 2 at 517 (1017).

[77] Stars' MSJ App., Vol. 2 at 512 (1012).

[78] Mavericks' MSJ Response App. at 30-38.

been located and maintained at 1333 N. Stemmons Freeway, Dallas, Texas; (ii) "[t]he principal corporate and executive offices and practice facilities where all Mavericks players, coaches, trainers, and administrative employees (collectively, the "Team") work and practice are located in Dallas, Texas"; (iii) "the Team's only corporate and executive offices have continually been maintained at" that same address; (iv) and the Team's practice facility has continuously been in a building adjacent to that address.[79]

[¶ 83] Lewis also provided pictures of the Team's corporate and executive offices at those Dallas locations.[80]

### 3. Analysis

#### a. Owners and Teams are different.

[¶ 84] Defined terms in the Location Commitments distinguish between the "Owners" and "Teams" as separate concepts with separate meanings. Those distinctions establish that for Location Commitment purposes the Owner designates where the Team's principal corporate and executive offices are located, not where the Owner's principal executive and corporate offices are located.

---

[79] Mavericks' MSJ Response App. at 30-38.

[80] Mavericks' MSJ Response App. at 32-38.

[¶ 85] But the agreements do not require any particular form of designation. So, the court refers to the common meanings of the words "location" and "designate" to discern their meaning here.

### b. "Location"

[¶ 86] The Merriam-Webster dictionary defines "location" as

1 a : a position or site occupied or available for occupancy or marked by some distinguishing feature : situation/Much of the charm of the house is in its location.

B (1) : a tract of land designated for a purpose/the location for a mining claim[81]

[¶ 87] Similarly, Dictionary.com defines "location" as

1. a place of settlement, activity, or residence./This town is a good location for a young doctor.

2. a place or situation occupied./a house in a fine location.

3. a tract of land of designated situation or limits./a mining location.[82]

### c. "Designate"

[¶ 88] According to the Merriam-Webster dictionary, the common definition of "designate" includes "1: to indicate and set apart for a specific

---

[81]Location, Merriam-Webster.com (last visited March 28, 2026).

[82] Location, Dictionary.com (last visited March 28, 2026).

purpose, office, or duty [. . . ] land *designated* as a wildlife refuge"; 2a: to point out the location of [] a marker designating the battle.[83]

[¶ 89]   Similarly, Dictionary.com defines "Designate" to mean "1.  To mark or point out; indicate; show; specify[;] 2 to denote; indicate; signify; 3 to name; entitle; style."[84]

[¶ 90]   Neither definition requires that a designation happen only in writing.   Indeed, the word "written" in the common parlance "written designation" is a limiting modifier that does not appear in the Location Commitments.   So, it follows that Dallas and the parties agreed that the Owners could designate their Teams' location other than in writing, such as by physical location and signage.

[¶ 91]   The Stars correctly argue that Secretary of State filings are prima facie evidence of facts stated in the document.[85]   *See* TEX. BUS. ORG. CODE § 4.005.   However, neither document states where the Mavericks' players, coaches, trainers, and administrative employees who represent the Franchise

---

[83] Designate, Merriam-Webster.com (last visited March 16, 2026) (emphasis in original).

[84] Designate, Dictionary.com (last visited March 16, 2026).

[85] Stars' Mavericks' Relocation Event MSJ at 9.

from time to time in competitive National Basketball Association games are located; that is, where that Team plays its home games and has its principal corporate and executive offices.[86]

### a. Public perception of the Team's local presence was important.

[¶ 92]   In context with the financing arrangements using bonds issued by Dallas, these terms objectively indicate the parties' intent that the public perception of the Teams' Dallas locations was more important than where their ownership executives were located.  In fact, "Team" is defined in the parties' franchise agreements based on what the public "know[s] as" the "Dallas Stars" and the "Dallas Mavericks," *i.e.* collectively the players, coaches, trainers, and administrative employees, not any particular entities.[87]

[¶ 93]   Thus, the court accepts the Mavericks' argument that the word "location" in § 2.1's caption and text indicate that the public's perception of where the Teams are physically located was more important to the overall arrangement than where corporate entities listed their offices on government filings.  *See Jones Constr.*, 650 S.W.3d. at 416 (Absent a limiting clause,

---

[86] Stars' MSJ App., Vol. 2 at 515-516 (1015-1016).

[87] Stars' MSJ App., Vol. 1 at 14, 25.

headings and titles provide context and can inform the meaning of sections they label.).

### b. Decision

[¶ 94] Based on construing the franchise agreements' terms, the common meanings of "location" and "designate," and the Agreements' overall purpose and context, the court concludes that the parties objectively and unambiguously intended for the Commitment Location clauses to mean a physical location in Dallas where (i) the fans would see the Stars and Mavericks play their home games and (ii) the Teams' offices would have a visible presence to the fans. That conclusion comports with the overall purpose to support Dallas's bond financing by promoting the Teams in Dallas. And it is the only reasonable interpretation that the contracts permit.

[¶ 95] So, Mr. Lewis's declaration, and its attached pictures, evidence that the Mavericks' Team's—as opposed to its Owner's or affiliated entities'—principal corporate and executive offices have been consistently designated and maintained in Dallas. The Stars did not conclusively prove otherwise.

[¶ 96] Accordingly, the court denies the Stars' Relocation Event summary judgment motion.

## VII. The Stars' "Limitations" MSJ

### A.    Introduction

[¶ 97]   The Mavericks assert two causes of action against the Stars: (i) a requested declaratory judgment that as of October 25, 2024, the Mavericks redeemed the Stars' interests and gained the right to designate Center GP's board members and (ii) the Stars have since tortiously interfered with the Mavericks' right to manage Center GP, COC, and the arena.[88]

[¶ 98]   The Stars' "Limitations" motion argues that the four-year limitations period, applicable to contract breach claims, bars the Mavericks' declaratory judgment claim.[89]   According to the Stars, (i) the Mavericks' cause of action accrued no later than 2003 when the Stars moved to Frisco; (ii) the Mavericks did not sue within four years of that date; and (iii) no tolling or other doctrine prevents applying limitations to this suit filed twenty-two years later.[90]

---

[88] Plaintiffs' Original Petition and Application for Injunctive Relief at 21-26; Plaintiffs' First Amended Petition and Application for Injunctive Relief at 29-36.

[89] Stars' Limitations MSJ at 1-2, 7-9.  The Stars' limitations motion also argues that no exceptions to limitations apply.  However, the court need not reach those issues because it concludes that the Stars did not conclusively prove a prima facie limitations defense.

[90] The Stars' Limitations MSJ at 1-2, 10-19.  The Stars' motion does not appear to independently challenge the Mavericks' tortious interference claim.   The Stars also preemptively address a Mavericks' continuing breach theory.  Stars' Limitations MSJ

[¶ 99]  The Mavericks respond that the Stars' motion fails because (i) the Stars' did not articulate a start date for running limitations; (ii) the Mavericks' declaratory judgment cause of action accrued on November 1, 2024, when the Stars' rejected the Mavericks' week-earlier redemption letter, and the Mavericks sued less than four years from that date; and (iii) the continuing breach doctrine prevents the Stars' limitations defense.[91]

## B.    Analysis and Decision

[¶ 100]  Limitations is an affirmative defense.  TEX. R. CIV. P. 94.  To win summary judgment on that defense, the Stars had to conclusively establish (i) when the cause of action accrued and (ii) the plaintiff brought its claim more than the applicable number of years thereafter.  *E.g., Riverside Strategic Capital Fund I, L.P. v. CLG Invests., LLC*, 2025 Tex. Bus. 35, ¶ 49, 722 S.W.3d 27, 35 (1st Div., appeal pending).

[¶ 101]  Determining when a cause of action accrues is a legal question for the court.  *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 274-75 (Tex. 2004).

---

at 12-19.  The Mavericks' response discussed a continuing breach theory.  Mavericks' Limitations MSJ Response at 19-27.  But the court need not reach that issue.

[91] Mavericks' Limitations MSJ Response at 6-7, 12, 14-19.

[¶ 102]   A declaratory judgment cause of action does not accrue until there is an actual, justiciable controversy between the parties.  *See e.g.*, *Murphy v. Honeycutt*, 199 S.W.2d 298, 299 (Tex. Civ. App.—6th Dist. 1946, writ ref'd); *In re Est. of Denman*, 362 S.W.3d 134, 144 (Tex. App.—4th Dist. 2011, no pet.); *see also*, *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (A declaratory judgment is appropriate only if real and substantial controversy involving genuine conflict of tangible interest and not merely a theoretical dispute exists.).

[¶ 103]   Here, there is credible evidence that an actual, justiciable controversy between the parties regarding the Mavericks' claimed redemptions did not arise until November 1, 2024, when the Stars rejected the Mavericks' redemption letter and refused to recognize their asserted redemptions.[92]  Accordingly, the court denies the Stars' Limitations summary judgment.[93]

---

[92] *See* Mavericks' MSJ App. at 39-43.  Given this ruling, the court need not address the remaining limitations arguments.

[93] The Mavericks also brought their tortious interference cause of action within two years after the Stars rejected the Mavericks' redemption letter.  *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 591 (Tex. 2017) (two-year statute of limitations period for tortious interference cause of action accrues when a contracting party knows the nature of the injury and damages).  There could have been no tortious interference until that time.

## VIII. The Stars' Original Impossibility Motion

### A.   Introduction

[¶ 104]   The Stars posit that the original impossibility doctrine bars the Mavericks' declaratory judgment cause of action because that claim relies on a contract term that was impossible to perform when the Stars signed its contracts.[94]   According to the Stars, original impossibility exists because they have continuously violated their Location Commitment since they signed their franchise agreement; thus, it was impossible for them to designate and maintain their offices in Dallas throughout their franchise agreement.[95]

[¶ 105]   The Mavericks respond that (i) original impossibility is a contract breach defense and they do not assert contract breach claims; (ii) nothing prevented the Stars from maintaining their Team's principal office in Dallas had they wanted to; (iii) the Stars could have avoided the redemption clauses by moving to Dallas before the redemption clauses came into existence; and (iv) the defense does not apply because the Stars knew where their offices were located when they signed their agreements.[96]

---

[94] *See* Stars' Original Impossibility MSJ at [4-6].   The court uses the bracketed numbers as the actual page numbers since the motion begins with four number "1" pages.

[95] Stars' Original Impossibility MSJ at [5-6].

[96] Mavericks' Original Impossibility Response at 5-6, 9-21.

## B.    Analysis and Decision

[¶ 106]   Original impossibility is a contract breach defense that applies where the promisor's performance is impossible because of facts that existed when the promise was made and about which the promisor did not know when it made the promise. *Janak v. FDIC*, 586 S.W.2d 902, 906-07 (Tex. App.—1st Dist. 1979, no writ).

[¶ 107]   The Stars concede that they never maintained their office in Dallas during a relevant time period, first being in Irving and then moving to Frisco in 2003—regardless of how one designates its principal corporate and executive offices.[97]   They also concede that they had at least a year between when they signed their franchise agreement and the COC and Center GP Agreements.[98]   Thus, there is more than a scintilla of credible evidence that, if their Location Commitment and redemption clause promises in the COC and Center GP Agreements were objectively impossible when the Stars signed those contracts, they had that knowledge before they made those promises.

[¶ 108]   Additionally, and alternatively, the Stars offered no evidence that (i) they could never have located their Team's offices in Dallas or (ii) that

---

[97] Stars' Original Impossibility MSJ at [5-6]; Stars' Waiver MSJ at 4.

[98] Stars' Original Impossibility MSJ at [9].

they could not have moved their offices to Dallas before the COC and Center GP Agreements became effective.

[¶ 109]   Accordingly, the court denies the Stars' Original Impossibility summary judgment motion.[99]

## IX. The Stars' Waiver Summary Judgment Motion

### A.   Introduction

[¶ 110]   Waiver is the voluntary relinquishment of a known right or intentional conduct inconsistent with asserting that right.  *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).  Its elements "are (1) an existing right, benefit, or advantage held by a party, (2) the party's actual knowledge of its existence, and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right." *Id.*  In determining whether waiver occurred, courts must examine the parties' words and conduct, which "must unequivocally manifest an intent to no longer assert the right being waived."  *EWB-I, LLC v. PlazAmericas Mall Tex., LLC*, 527 S.W.3d 447, 466 (Tex. App.—1st Dist. 2017, pet. denied).

---

[99] Given these rulings, the court need not address the remaining arguments.

[¶ 111] The Stars proffer three reasons why waiver defeats the Mavericks' redemption rights: (i) the Mavericks' twenty-plus years' of inaction, despite knowing that the Stars' offices were not in Dallas, impliedly waives those rights; (ii) designating Las Vegas as the Mavericks' principal office and place of business is inconsistent with their redemption efforts; and (iii) the Mavericks waived the Agreements' nonwaiver clauses.[100]

[¶ 112] The court denies the Stars' waiver motion because (i) the parties' nonwaiver clauses preclude waiver-by-delay in exercising rights or remedies arising from the other side's breached covenants, duties, agreements, or conditions and (ii) the Stars did not conclusively prove that the Mavericks knowingly and intentionally waived their redemption rights by affirmatively designating Las Vegas as where their principal corporate and executive offices shall be maintained or otherwise engaged in conduct manifestly inconsistent with exercising those rights.

[¶ 113] This waiver discussion should be read together with the court's part XI(B) waiver discussion and vice versa.

---

[100] Stars' Waiver MSJ at 1-2. The Stars' response to the Mavericks' Declaratory Judgment motion more specifically argues that the Mavericks impliedly waived their redemption rights by permitting the Stars to conduct financial transactions with COC. *See* Stars' Affirmative Defenses Response at 5-6, 15-16.

### B.   The Stars' Arguments

#### 1.  The Mavericks knew where the Stars maintained their offices.

[¶ 114]   First, the Stars rely on *Tenneco*, 925 S.W.2d at 643, to argue that the Mavericks' decades-long failure to redeem despite knowing that the Stars' location was outside Dallas is intentional conduct inconsistent with asserting their redemption.[101]  They base their argument on these undisputed facts: (i) their office locations have always been public knowledge; (ii) notices from the Stars' 2011 bankruptcy sale gave the Mavericks actual knowledge of the Stars' office location; and (iii) the Mavericks' Texas Legends basketball team leased space in Stars' facilities.[102]

[¶ 115]   Relying on *Tenneco*, the Stars argue that the Mavericks' failure to exercise their redemption rights for decades despite that knowledge proves implied waiver as a matter of law.[103]

#### 2.  Las Vegas

[¶ 116]   Second, the Stars urged that the "the Mavericks acted wholly inconsistent with the right to declare a 'Relocation Event' when they

---

[101] This argument effectively concedes the Stars' Location Commitment breach.

[102] Stars' Waiver MSJ at 10-13.  Thus, the Stars acknowledge that unless a contract provides otherwise, actual knowledge of facts is effective.

[103] Stars' Waiver MSJ at 10-13.

designated Las Vegas, Nevada as the principal office and place of business."[104]

The Stars rely on the same evidence for this argument that they relied on in their "Mavericks' Relocation Event" motion.[105] Based on that evidence, they argue that the same Mavericks' action they claim violates the COC and Center GP Agreements also waived their right to redeem the Stars' interests.[106]

### 3. The Mavericks' Nonwaiver Clauses

[¶ 117] Finally, the Stars acknowledge that the COC and Center GP Agreements contain these identical nonwaiver clauses:

> 13.8 <u>Waiver</u>. No failure by any party to insist upon strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.[107]

[¶ 118] They cite *Shields*, 526 S.W.3d at 474, for the point that "[t]o waive a nonwaiver clause, 'there must be at a minimum, some act inconsistent with its terms.'"[108]

---

[104] Stars' Waiver MSJ at 14.

[105] Stars' Waiver MSJ at 1-8, 14.

[106] Stars' Waiver MSJ at 14.

[107] Stars' MSJ App., Vol. 1 at 106, 191 (emphasis in original).

[108] Stars' Waiver MSJ at 15.

[¶ 119]   From there, they cite *EWB-I*, 527 S.W.3d at 469, to argue that a nonwaiver clause based on inaction does not apply to a waiver based on affirmative breaches.[109]  They then argue that the Mavericks' designation of their principal office and place of business and location of DSRA's controlling person in Las Vegas, Nevada conclusively waives the nonwaiver clause and thus permits waiver of the Mavericks' redemption rights.[110]

## C.    The Mavericks' Responses

[¶ 120]   The Mavericks responded that (i) the nonwaiver clauses are facially dispositive; (ii) their prior non-action of their redemption rights does not waive the nonwaiver-by-inaction clauses; and (iii) the Stars did not identify affirmative conduct that waived (a) the nonwaiver clauses or (b) the Mavericks' redemption rights.[111]

[¶ 121]   First, the Mavericks rely on *Shields*, 526 S.W.3d at 481-93, to argue that to waive a nonwaiver clause a party must manifest clear intent to do so; otherwise, the clause is facially dispositive that waiver cannot be based

---

[109] Stars' Waiver MSJ at 16.

[110] Stars' Waiver MSJ at 15-6.  The Mavericks' Original and First Amended Petitions define "DSRA" as Dallas Sports Group, LLC and Radical Arena, Ltd, collectively the Mavericks.

[111] Mavericks' Waiver Response, pp. 11-20.

on the same nonaction protected by the clause.[112]  So, they argue that these clauses unambiguously prevent waiver based on a delay in asserting their rights and remedies regarding a Stars' breach of their Location Commitment conditions.[113]

[¶ 122]  Second, they urge that the Stars "cherry-pick" *Tenneco* to argue that the Mavericks' delay in exercising their redemption rights waived those rights.[114]  The Mavericks then cite *Location, Location, Location, Ltd. v. Home Depot USA, Inc.*, No. 07-21-00036-CV, 2022 WL 215131 (Tex. App.—7th Dist. Jan. 25, 2022, no pet.) (mem. op.) as an example where an eleven-year delay in asserting rights did not waive those rights due to an "inaction nonwaiver clause."[115]

[¶ 123]  Finally, regarding the Stars' "Las Vegas designation" theory, the Mavericks argued that: (i) they have always maintained the "Team's" principal corporate and executive offices in Dallas;[116] and (ii) had the

---

[112] Mavericks' Waiver Response at 11.

[113] Mavericks' Waiver Response at 11-14.

[114] Mavericks' Waiver Response at 14-15.

[115] Mavericks' Waiver Response at 15-16.

[116] Mavericks' Waiver Response at 17.

Mavericks relocated to Las Vegas, that would not be inconsistent with both the nonwaiver clause or the right to redeem.[117]

## D.   Analysis and Decision

[¶ 124]   For purposes of this discussion, the court assumes without concluding that the Mavericks always knew where the Dallas Stars' Team was located.

### 1. The Stars' *Tenneco* Argument

[¶ 125]   To begin, although *Tenneco* upheld the principle of implied waiver-by-inaction, it does not support the Stars' waiver arguments for at least these alternative, independent reasons.  First, unlike the present case, *Tenneco* does not involve a nonwaiver clause addressing conduct that the defendants argued amounted to waiver.  *See Tenneco*, 925 S.W.2d at 643-44.

[¶ 126]   Second, the plaintiff's inaction in *Tenneco* was in the face of the defendant's direct breaches of contract duties owed to those plaintiffs.  Whereas the Stars' Location Commitment promise was a covenant they made to Dallas, not the Mavericks.  Thus, the Stars' breach vis-à-vis Dallas did not

---

[117] Mavericks' Waiver Response at 17-21.

directly impact the Mavericks nor prompt a reason for them to respond urgently.

[¶ 127]  Third, *Tenneco* affirms that "courts will not rewrite agreements to insert provisions parties could have included or imply restraints for which they have not bargained."  *Id.* at 646.  Because the Stars' breach of their Location Commitment to Dallas merely triggers the Mavericks' redemption opportunity, accepting the Stars' waiver-by-inaction premise would rewrite the COC and Center GP Agreements to impose an affirmative duty on the Mavericks to redeem or lose their rights.  Because these parties did not include that duty in *their* contracts with each other, the court cannot insert that duty for them.  *Id.*

### 2. The Nonwaiver Clauses

#### a. Implied Waiver-by-Inaction

[¶ 128]  The Mavericks' response relies heavily on the nonwaiver clauses to defeat the Stars' waiver motion.[118]  *Shields* and *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668 (Tex. 2020), provide the legal baseline for analyzing the parties' arguments.

---

[118] Mavericks' Waiver Response, *passim*.

[¶ 129] For starters, *Chalker* and *Shields* emphasize Texas's strong public policy favoring sophisticated parties' freedom to order their relationship through contract agreements, absent violation of law or public policy. *Chalker*, 595 S.W.3d at 673; *Shields*, 526 S.W.3d at 481-82.

[¶ 130] Next, those cases hold that waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with asserting that right. *Chalker*, 595 S.W.3d at 676; *Shields*, 526 S.W.3d at 474. And "[w]hile ordinarily a fact question, when the facts and circumstances are undisputed, waiver may be decided as a matter of law." *Chalker*, 595 S.W.3d at 676-77.

[¶ 131] *Chalker* and *Shields* also confirm that establishing implied waiver—waiver by conduct—requires intentional conduct that is unequivocally inconsistent with the known right at issue:

> There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right. In other words, to establish waiver by conduct, that conduct must be unequivocally inconsistent with claiming a known right.

*Chalker*, 595 S.W.3d at 677 (quoting *Shields*, 526 S.W.3d 485). Stated differently, engaging in conduct that is the subject of the nonwaiver clause does not constitute waiver based on that conduct.

[¶ 132] More specifically, a nonwaiver-by-inaction clause is a bargained-for agreement that the nonbreaching party can delay acting without forfeiting its right to act later.

[¶ 133] So, the COC and Center GP Agreements' nonwaiver clauses negate the Stars' argument that the Mavericks waived their redemption rights by failing to exercise them earlier despite their knowledge that the Stars were not located in Dallas:

> [t]he Texas Supreme Court has held that waiver of a nonwaiver provision cannot be "anchored in the same conduct the parties specifically agreed would not give rise to a waiver of contract rights."

*Location*, 2022 WL 215131, *4 (quoting *Shields*, 526 S.W.3d at 474) (nonwaiver-by-delay clause applied to thirteen-year delay in suing to enforce restrictive covenant).

### b. Implied Waiver by Affirmative Conduct

[¶ 134] Although the nonwaiver clauses negate the Stars' waiver-by-inaction argument, they do not bear on whether the Mavericks waived their redemption rights by engaging in different acts outside the nonwaiver clauses' scope. *See EWB-I*, 527 S.W.3d at 467-69.

[¶ 135] Thus, the Stars again reference the same government filings listing Las Vegas as the principal office, principal place of business, or mailing

address for DBL; Dallas Sports Group Management, LLC; EMAVS, LLC; Radical Mavericks II, LTD; DSG (or its Governing Person) that they relied on for their earlier Mavericks' Relocation Event arguments as independent, affirmative conduct impliedly waiving the Mavericks' right to exercise their redemption rights.[119]

[¶ 136] The court rejects the Stars' argument for at least two reasons.[120] First, those filings say nothing about redemption rights, nor do they involve the act of redeeming anything.

[¶ 137] Second, as with the Stars' "Mavericks' Relocation Event" motion, those filings (all of which post-date the Mavericks' redemption letter) do not address where the "Team's" principal offices are designated or located. Where the "Owner" or corporate affiliates list their offices on government filings does not represent where the Team's public-facing offices are located.

### 3. The Stars' Replies

[¶ 138] The court rejects the Stars' reply arguments for these reasons:

[¶ 139] First, the Stars' argument that the Mavericks' statement that their first principal and corporate offices were on LBJ Freeway is unsupported

---

[119] Stars' Waiver MSJ at 14-16.

[120] *See* part IV, above.

in Mr. Lewis's declaration is accurate. But the Stars' point is irrelevant because where the Mavericks' first offices were located is not relevant to deciding the current issues.[121]

[¶ 140] Second, the Stars argue that Mr. Lewis's statements about the Team's offices cannot be squared with the corporate filings listing offices and mailing addresses in Las Vegas.[122] The court rejects that argument because Mr. Lewis's declaration refers to the "Team's" offices as the Mavericks' franchise agreement defines that term[123] whereas the corporate filings do not.[124]

[¶ 141] Third, the Stars argue that neither the Mavericks' response nor Mr. Lewis say anything about the Mavericks' "***designation***" of Dallas as their principal corporate and executive offices, whereas the Texas Franchise Tax Public Information Report "designated" Las Vegas as the relevant address.[125] The court rejects that argument because that tax form does not use the verb

---

[121] Stars' Waiver Reply at 4.

[122] Stars' Waiver Reply at 4-5.

[123] *Compare* Lewis Dec., ¶s 2-4 and attached exhibits *with* Stars' MSJ App., Vol. 1 at 25.

[124] Stars' MSJ App., Vol. 2 at 515-518 (1015-1018).

[125] Stars' Waiver Reply at 5 (emphasis in original).

"designate" either.[126]  More importantly, the franchise agreements do not specify a required designation method, and the Mavericks' evidence satisfied the common, ordinary meaning of the verb as applied to the defined term "Team."[127]

[¶ 142]  Finally, part II(B) of the Stars' reply discusses the nonwaiver clauses and their effects.[128]  The court reviewed and rejects those arguments for the reasons stated in part IV above and part XI below.

### 4. Conclusion

[¶ 143]  Accordingly, the court denies the Stars' Waiver summary judgment motion.

## X. The Mavericks' Declaratory Judgment Motion

### A. Introduction

[¶ 144]  In broad strokes, the Mavericks' Declaratory Judgment motion argues that they are entitled to a judgment declaring that their redemptions are valid and they are entitled to control the board because the Stars violated

---

[126] Stars' MSJ App., Vol, 2 at 515 (1015).

[127] *See* part VI above.

[128] Stars' Waiver Reply at 6-12.

their Location Commitment to Dallas, which triggered the Mavericks' redemption rights under the COC and Center GP Agreements.

[¶ 145]  The Mavericks also seek to enforce Section 7.2(e) of the Center GP Agreement, which states that a Relocating Partner's appointed board members are deemed to have resigned upon relocation.

[¶ 146]  The parties largely repeat arguments they made regarding the Stars' motions.  So, the court endeavors to summarize those arguments and focus on new points.

## B.    The Stars' Principal Corporate and Executive Offices

[¶ 147]  It is undisputed that at no relevant point before the Mavericks sent their redemption letter did the Stars designate or maintain in any form—physically, through signage, or in writing—their Team's principal corporate and executive offices in Dallas.  Indeed, Mr. Alberts, the Stars' Chief Executive Officer, conceded as much:[129]

---

[129] Stars' MSJ App., Vol. 1 at 7; *see* Mavericks' MSJ App. at 229.

4.     From 1998 until 2003, the prior owner of the Dallas Stars, Dallas Stars, L.P., maintained offices in Irving, Texas. In 2003, the Dallas Stars moved their offices and practice facility to 2601 Avenue of the Stars, Frisco, Texas.

5.     Since DSE Hockey Club L.P. closed on its purchase of Dallas Stars, L.P.'s assets on November 18, 2011, the team has operated at 2601 Avenue of the Stars, Frisco, Texas in the same way that the Dallas Stars did before the sale. Nothing changed regarding the Stars' use of the Frisco location prior to the events in 2024 which precipitated this lawsuit.

[¶ 148]   And the Mavericks submitted additional evidence of the Stars' executive offices being in Frisco.[130]

[¶ 149]   So, as a matter of unambiguous contract construction, the Stars' failure to designate and maintain their Team's principal and corporate offices in Dallas breached their Location Commitment to Dallas.[131]  *Equinor Energy*, 2026 WL 705761, *2; *see* discussion in part IV(B) above.

## C.   Prior Adjudication of Breach

[¶ 150]   Anticipating that the Stars would respond with their November 1, 2024, argument that no redemption occurred because the Mavericks could

---

[130] Mavericks' MSJ App. at 188-191.   The Mavericks also submitted evidence regarding the Stars' acts post-redemption letters to open offices in Dallas.  Mavericks' MSJ App. at 188-195.  In reaching its conclusions, the court need not and does not consider those acts.

[131] *See* Stars' MSJ App., Vol. 1 at 14.

not unilaterally declare a breach of the Stars' Location Commitment,[132] the Mavericks argued that the court is to give the word "breach" in COC Agreement § 4.8(c) and Center GP Agreement § 4.5[133] its ordinary meaning.[134] They then add that "breach's" ordinary meaning is "[a] violation or infraction of law, obligation or agreement, esp. of an official duty or legal obligation, whether by neglect, refusal, resistance, or inaction."[135]

[¶ 151] Next, they assert that because those sections do not contain prior adjudication requirements, no such requirement exists and the court may not add them.[136] As further support, they add that COC Agreement's indemnity clause does include a prior liability finding, thus applying the *exclusio unius est exclusio alterius* canon reinforces the conclusion that §§ 4.8

---

[132] *See* Mavericks' MSJ Response App. at 39-43.

[133] The term "breach" does not appear in the Center GP Agreement; however, the definition is incorporated through the Center GP Agreement's adoption of the COC Agreement's definition of Relocation Event. *See* Mavericks' MSJ App. at 34.

[134] Mavericks' Declaratory Judgment MSJ at 38.

[135] Mavericks' Declaratory Judgment MSJ at 38-39 (citing *Breach*, BLACK'S LAW DICTIONARY (12th ed. 2024)).

[136] Mavericks' Declaratory Judgment MSJ at 38-41.

and 4.5 do not require a prior adjudication of breach to trigger their redemption rights.[137]

[¶ 152]  The Stars did not challenge the Mavericks' argument.

## D.  Consideration

[¶ 153]  The Mavericks argued that the Stars received the $110 consideration required to exercise the redemption rights.[138]  The Stars do not dispute that tender.

[¶ 154]  Instead, the Stars urge that COC Agreement § 4.8(b) and Center GP Agreement § 4.5(b) require prior bookkeeping entries adjusting the capital accounts as conditions to exercising redemption rights and the Mavericks admit that those entries have not been made.[139]

[¶ 155]  The Mavericks reply that the redemption occurred when they exercised their contract right to cause it by sending their redemption letter, and any follow-on accounting and payments are ministerial and do not alter the redemption's effectiveness.[140]

---

[137] Mavericks' Declaratory Judgment MSJ at 40-41; *see Primexx*, 2025 Tex. Bus. ¶ 69.

[138] Mavericks' Declaratory Judgment MSJ, pp. 43-44; Mavericks MSJ App. at 189, 201-202.

[139] Stars' Declaratory Judgment Response at 21-22.

[140] Mavericks' Declaratory Judgment Reply at 18.

[¶ 156]   Neither § 4.8 nor § 4.5 contain words indicating that completed bookkeeping entries are conditions precedent to effective redemptions.[141]   *See Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) ("While no particular words are necessary for the existence of a condition, such terms such as 'if', 'provided that', 'on condition that', or some other phrase that conditions performance, usually connate an intent for a condition rather than a promise.")   And the court cannot impose a condition that the parties omitted from their agreements under the guise of construing their contracts.  *Sundown Energy LP v. HJSA No. 3 P'ship*, 622 S.W.3d 884, 889 (Tex. 2021).

[¶ 157]   Moreover, by their terms, §§ 4.8(b) and 4.5(b) provide that the capital account adjustment is automatic and thus ministerial.[142]   *See id.* ("Courts are obliged to enforce the parties' bargain according to its terms.").

---

[141] *See* Stars' MSJ App., Vol 1 at 77, 155-56.

[142] *See* Stars' MSJ App., Vol. 1, at 77, 155-56.

[¶ 158]  Accordingly, the court rejects the Stars' argument that the redemptions failed because the Mavericks did not first cause the bookkeeping entries' correlation with the automatic capital account reductions.[143]

## E.  Causation

[¶ 159]  The Mavericks argue that the Stars' Location Commitment breach with Dallas triggered the Mavericks' right to cause the redemptions, which they effected with their October 25, 2024, letter and $110 cash tender.[144]

[¶ 160]  The Stars responded that the Mavericks could not unilaterally redeem the Stars' interests, rather only the entities themselves are capable of completing the redemptions.[145]

[¶ 161]  For the reasons explained in part V above regarding the Stars' Standing MSJ, the court concludes that undisputed facts establish as a matter of law that the Mavericks effectively caused the redemptions.

---

[143] The court also accepts the Mavericks' argument that the Stars cannot prevent the redemptions by not cooperating with those bookkeeping entries.  *See* Mavericks' Declaratory Judgment Reply at 14-18.

[144] Mavericks' Declaratory Judgment MSJ at 41-43.

[145] Stars' Declaratory Judgment Response at 17-19.

[¶ 162] Moreover, the court concludes that the Mavericks' declaratory judgment action based on the Stars' rejection of the Mavericks' redemption letter is a viable other or supplemental method for causing the redemption.[146]

## F. The Stars' Las Vegas Arguments

[¶ 163] The Stars' response largely repeats their "Mavericks' Relocation Event" summary judgment arguments to argue that the Mavericks are not a Remaining Partner/Member and thus legally incapable of effecting the redemptions.[147] The Stars also argue that the Mavericks' focus on the Team's physical location improperly renders "designate" in the Location Commitments meaningless and asks the court to give that word a meaning other than its common, ordinary meaning.[148]

[¶ 164] However, in making that argument, the Stars' response used ellipses to de-emphasize the phrase "of the Team" in the Location Commitments' location requirement:

> . . . because the Mavericks' Franchise Agreement requires that 'the Owner shall continuously designate the City as the

---

[146] *See* TEX. BUS. ORG. CODE § 101.463 (LLCs), § 153.413 (limited partnerships). Partners/members in closely held entities may treat derivative suits as if they were direct actions brought by the partner/member for their own benefit.

[147] *See* Stars' Declaratory Judgment Response at 11-17.

[148] Stars' Declaratory Judgment Response at 12-13.

location . . . in which the principal corporate and executive offices shall be maintained'[.][149]

[¶ 165]  That omission is telling because those omitted words connect the designated location to the Team (meaning where the players, coaches, trainers, and administrative employees have their principal office and they play their home games) as opposed to the Owners' principal office.  Connecting the designated location to the Team is consistent with requiring the Team's public-facing presence to be in Dallas, not any identified offices for the Owners or their affiliates.[150]

[¶ 166]  Thus, the court rejects the Stars' Las Vegas arguments for those reasons and the reasons discussed in part VI above.

## G.    Unilateral Redemption

[¶ 167]  The Stars' response urges the court to deny the Mavericks' motion because the Mavericks cannot unilaterally redeem the Stars' COC and Center GP interests.[151]  The court rejects the Stars' arguments for the reasons discussed in part V(B)(2)(a).

---

[149] Stars' Declaratory Judgment Response at 12 (ellipsis in original).

[150] *See* part VI above.

[151] Stars' Declaratory Judgment Response at 17-20.

## H. Capital Account Adjustments

[¶ 168]   The Stars respond that the Mavericks allegedly admit that the redemption requirements have not been met.[152]   The Stars rest that argument on the fact that actual bookkeeping entries to the Stars' capital accounts to reflect the adjustments needed to produce the $100 and $10 redemption tender amounts have not occurred.[153]   The court rejects that argument as a matter of law for the reasons discussed in part V(B)(2)(a) above.

## I. Ambiguity

[¶ 169]   The Stars' response argues that the Stars' franchise agreement is ambiguous regarding the Location Commitment's "principal office" phrase.[154]   The court rejects that argument for the reasons discussed in part VI above.

## J. Mavericks' Remaining Partner/Member Status

[¶ 170]   For the reasons discussed in this part X, the court concludes that the Mavericks established as a matter of law that they are a Remaining Partner/Member within the meaning of the COC and Center GP Agreements.

---

[152] Stars' Declaratory Judgment Response at 21-22.

[153] Stars' Declaratory Judgment Response at 21-22.

[154] Stars' Declaratory Judgment Response at 22-25.

**K. The Stars' Affirmative Defenses**

[¶ 171] Finally, the Stars adopted their five summary judgment motions, related evidence, and arguments as sufficient to at least raise fact issues on each affirmative defense that is the subject of those motions.

[¶ 172] For the reasons discussed in parts V through IX above, the court concludes that the Stars did not adduce evidence sufficient to raise a genuine issue of material fact regarding all elements of those affirmative defenses.

**L. Conclusion**

[¶ 173] Accordingly, the court grants the Mavericks' request for a declaration (i) that they effectively caused a redemption of the Stars' entire interests in COC and Center GP on October 25, 2024, and (ii) Thomas Gaglardi, Therese Baird, and Brad Alberts were terminated from the board of directors of Center GP LLC on that date.

## XI. The Mavericks' Affirmative Defenses Motion

**A. Introduction**

[¶ 174] The Mavericks sought summary judgment dismissing the Stars' waiver and laches affirmative defenses.[155] First, the Stars' waiver response asserts implied waiver by affirmative conduct.

---

[155] Mavericks' Affirmative Defenses Motion, *passim*.

[¶ 175]   Second, the court rejects the Stars' laches defense for these alternative reasons: (i) laches does not apply to purely legal causes of action; (ii) the laches period does not extend beyond an applicable statute of limitations; (iii) the nonwaiver clause applies to laches to the same extent it applies to limitations; (iv) the Stars did not raise a genuine issue of material fact that would support the laches defense if it did apply; and (v) the Stars did not raise the defense in response to the Mavericks' Declaratory Judgment motion.

## B.   The Waiver Issue

### 1.  Introduction

[¶ 176]   The Mavericks argue that the COC and Center GP Agreements' nonwaiver clauses negate the Stars' waiver defense to the extent the Stars assert waiver based on any Mavericks delay, tolerance, or forbearance in asserting their redemption rights.[156]   This waiver discussion should be read together with the court's part IX waiver discussion and vice versa.

[¶ 177]   The Stars respond that the court must determine whether waiver can occur despite the nonwaiver clauses and that they adduced more

---

[156] Mavericks' Affirmative Defenses Motion at 2, 5-8.

than a scintilla of evidence supporting their waiver defense.[157]   Those arguments focus on the whether the Mavericks engaged in affirmative acts inconsistent with their nonwaiver clause right to delay taking action.[158]  They also assert that the nonwaiver clauses are unenforceable as too broad.[159]

## 2. Analysis

[¶ 178]   At bottom, the Stars argue that the Mavericks waited too long to exercise their redemption rights.  But the parties agreed that the Mavericks could wait to act until it suited their interests to act without losing those rights:[160]

> 13.8    Waiver.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

[¶ 179]   The parties could have agreed to a time limit on the nonwaiver rights; but they did not and the court cannot add one for them.  *E.g.*, *Equinor*, 2026 WL 705761 at *2.

---

[157] Stars' Affirmative Defenses Response at 1.

[158] Stars' Affirmative Defenses Response at 13-16.

[159] Stars' Affirmative Defenses Response at 1.

[160] Stars' MSJ App., Vol. 1 at 106, 191.

[¶ 180]  So, to avoid the nonwaiver clauses' effects, the Stars "must show a clear intent to waive both the clause[s] and the underlying provision." *Shields*, 526 S.W.3d 475, n.6 (quoting 13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013)).  Stated differently, the Stars had to submit more than a scintilla of evidence that the Mavericks' affirmative conduct demonstrates (i) their manifest intent to waive their right to delay exercising their redemption rights until it suited their interests and (ii) their intent to not exercise their redemption rights.

[¶ 181]  The court concludes that the Stars did not adduce evidence that carries either burden.  To begin, the Mavericks bargained for their right to delay exercising redemption rights until it suited their interests to do so.  And it is undisputed that is what the Mavericks did.  Thus, exercising that bargained-for right to wait is no evidence of an intent to waive the nonwaiver clauses or the Mavericks' redemption rights.

### 3. Affirmative Acts

#### a.  Las Vegas

[¶ 182]  The Stars argue that the Mavericks' alleged designations of Las Vegas as their principal corporate and executive office were affirmative acts

sufficient to raise a fact issue regarding the Stars' waiver defense.[161] These arguments replicate their Mavericks' Relocation Event summary judgment arguments.[162] The court rejects those arguments here for the same reasons it denied that motion and concludes that the Stars did not raise a genuine dispute of material fact on this issue.[163]

[¶ 183] Moreover, waiting until after the Mavericks exercised their redemption rights to designate the location of their principal corporate and executive offices in Las Vegas (if that happened) would be consistent with waiting to exercise those rights until it suited their interests.

[¶ 184] So, the court concludes that those post-redemption letter corporate filings do not raise a fact issue supporting a conclusion that the Mavericks intended to thereby waive their nonwaiver or redemption rights.

### b. Consent to Distributions, Rent Payments, and Capital Contributions

[¶ 185] The Stars also urge that the Mavericks—as a COC co-owner— over two decades engaged in affirmative conduct inconsistent with asserting their redemption rights by (i) acquiescing in COC accepting rental payments

---

[161] Stars' Affirmative Defense Response at 14-15.

[162] *See* parts VI and X(J) above.

[163] *See* parts VI and X(J) above.

and capital contributions and (ii) consenting to COC making distributions to the partners.[164]

[¶ 186]   The Stars rely on these statements from Mr. Alberts to support those arguments:[165]

> 5.      Prior to October 2024, the Mavericks' affiliates under the COC and CGP Agreements consented to Center Operating Company, L.P. ("COC") making ownership distributions to the Stars since at least 2013.  The last COC distribution to the Stars occurred in September 2024.
>
> 6.      The Mavericks' affiliates under the COC and CGP Agreements consented to the Stars making capital contributions to COC at numerous intervals over the past two decades—with one as recently as September 2024.
>
> 7.      The Mavericks' affiliates under the COC and CGP Agreements have accepted rental payments from the Stars, through COC, for decades.

[¶ 187]   The court rejects the Stars' arguments for several alternative reasons.  First, those events are the Stars' direct transactions with COC (not with the Mavericks).  Regardless, those transactions are consistent with the Mavericks exercising their right to wait until they deemed it in their interest to exercise their redemption rights.  That is, those events comport with the

---

[164] Stars' Affirmative Defenses MSJ Response at 15-16.

[165] Stars' MSJ App. Vol. 3 at 5 (1036).

Mavericks choosing to rely on the nonwaiver clauses to preserve their redemption rights until the time of their choosing.  Thus, those acts are not inconsistent with the nonwaiver clauses or the Mavericks reserving their ability to exercise their redemption rights.

[¶ 188]  Second, the Mavericks benefitted from those transactions.  The Stars' capital contributions meant the Mavericks spent less of their money on those items.  Likewise, the Stars' rent payments meant there was more money to support the arena and lighten the Mavericks' burden.  Partnership distributions meant that the Mavericks were getting their share too.  Nothing about those events is inconsistent with the Mavericks' right to delay exercising their redemption rights until it was in their interests to do so.  In short, the Stars are effectively asking the court to impose a duty on the Mavericks to subvert their interest to the Stars' interest.  But there is nothing in their relationship that would permit the court to imply that obligation into the COC or Center GP Agreements.  *See, e.g.*, *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992).

[¶ 189]  Third, the Stars' Location Commitment was their contract obligation to Dallas—not the Mavericks.  The Stars offered no evidence that the Stars' contract breach with Dallas was an issue for the Mavericks before

the Mavericks exercised their redemption rights. If Dallas was not doing something about it, why would the Mavericks want to "rock the boat"? The Stars-Dallas breach was not a Mavericks issue until 2024 when that breach created leverage the Mavericks could use to their advantage when negotiating with the Stars about appropriate Arena repairs and improvements. That is, the Stars offered no evidence that the Mavericks had a reason to exercise their rights until they did so. The situation here is like a landlord with a nonwaiver clause choosing to wait until it suits its purposes to evict a tenant for late rent payments despite the landlord previously accepting late payments. *See Shields*, 526 S.W.3d at 480; *Giller Indus., Inc. v. Hartley*, 644 S.W.2d 183, 184 (Tex. App.—5th Dist., 1982, no writ).

[¶ 190] Finally, the Stars produced no evidence that the Mavericks said anything to the Stars or did any affirmative acts that misled the Stars into believing that the Mavericks would not exercise their redemption rights earlier. For example, the Stars adduced no evidence that the issue was ever discussed between the parties before 2024.

[¶ 191] Accordingly, the court concludes that the Stars' evidence did not raise a genuine issue of material fact that would support a finding that the

Mavericks engaged in affirmative conduct manifestly inconsistent with their intent to enforce their nonwaiver rights or their redemption rights.

### 4. Waiver Cases

#### a. Introduction

[¶ 192]   The Stars' response does not dispute the general premise that nonwaiver clauses can be valid in some cases, but they argue that these nonwaiver clauses are too broad to be enforceable.[166]  Specifically, they argue that *Shields* and *Giller*, which the Mavericks cited,[167] are distinguishable and thus inapplicable.[168]  The court concludes that the Stars are mistaken.

#### b. *Shields*

[¶ 193]   In *Shields*, a commercial landlord sought to remove a long-term tenant.  The tenant frequently defaulted on its rent payments, which the landlord regularly accepted when tendered.  Nonetheless, the landlord relied on a nonwaiver clause to support his right to evict the tenant despite his practice of accepting late payments.  After a bench trial, the trial judge entered judgment for the tenant, which the court of appeals affirmed.  The supreme

---

[166] *See* Stars' Affirmative Defenses Response at 16-20.

[167] Mavericks' Affirmative Defenses MSJ at 6-7.

[168] *See* Stars' Affirmative Defenses Response at 16-20.

court reversed, holding that as a matter of law the nonwaiver clause precluded the tenant's waiver defense based on the landlord's prior acceptance of late payments. 526 S.W.3d at 481-85.

[¶ 194] The *Shield*s nonwaiver clause stated that,

All waivers must be in writing and signed by the waiving party. Landlord's failure to enforce any provisions of this Lease or its acceptance of late installments of Rent shall not estop Landlord from enforcing that provision or any other provision of this Lease in the future.

*Id.* at 481.

[¶ 195] The court considered nonwaiver clauses' force and effect in light of Texas's public policy strongly favoring freedom of contract and held that "there can be no doubt that, as a general proposition, nonwaiver provisions are binding and enforceable." *Id.* So, the issue was not whether the nonwaiver clause was enforceable, but whether it was waivable and, if so, the circumstances under which waiver could occur. *Id.* at 481-82.

[¶ 196] Regarding whether the clause was waivable, the court held that, like all contract rights, that clause was waivable:

We agree a nonwaiver provision absolutely barring waiver in the most general terms might be wholly ineffective. But we cannot agree that a nonwaiver is wholly ineffective in preventing waiver through conduct the parties explicitly agree will never give rise to waiver. Such a contract-enforcement principle would be "illogical, since the very conduct which the clause is designed to

permit [without effecting a waiver would be] turned around to constitute waiver of the clause permitting [a party to engage in] the conduct [without effecting a waiver]."

*Id.* at 484 (quoting *Van Bibber v. Norris*, 275 Ind. 555, 419 N.E.2d 115, 121 (1981) (alterations in original).

[¶ 197]   Thereafter, the supreme court observed that the tenant had not asserted there was an express written waiver.  Thus, it analyzed whether implied waiver supported the trial court's judgment based on the landlord's conduct in accepting late rent payments.  *See id.* at 484-86.  In that regard, the supreme court held that, "[w]hile waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right."  *Id.* at 485 (quoting *Van Indep. Sch. Dist. v. McCarty,* 165 S.W.3d 351, 353 (Tex. 2005) (alterations in original).  More precisely, the court held "that engaging in the very conduct disclaimed as a basis for waiver is insufficient as a matter of law to nullify the nonwaiver provisions the parties' [contract]."  *Id.* at 484-85 (alteration added).

[¶ 198] Nonetheless,  to  argue  that  the  present  clauses  are unenforceable, the Stars identify textual differences between the *Shields*

clause and the present clauses.[169]  First, they note that unlike the *Shields* clause, the clauses at bar do not require a signed, written waiver to exist.[170] But they do not explain why that difference matters.[171]

[¶ 199]  The court concludes that the distinction does not matter because (i) it did not factor into the supreme court's reasoning in *Shields*, (ii) the Stars offered no explanation why that absence here matters, and (iii) the court does not see how that absence alters the outcome.

[¶ 200]  Second, the Stars posit that the present nonwaiver clauses impermissibly attempt to exclude waiver entirely.[172]  But nothing in those clauses purport to do any such thing.[173]  Moreover, the present clauses identify specific conduct that does not waive the rights under those Agreements.[174]

[¶ 201]  Accordingly, the court concludes that nothing in *Shields* renders the Mavericks' nonwaiver clauses unenforceable.[175]

---

[169] Stars' Affirmative Defenses MSJ Response at 17-18.

[170] Stars' Affirmative Defenses MSJ Response at 17.

[171] Stars' Affirmative Defenses MSJ Response at 17-18.

[172] Stars' Affirmative Defenses MSJ Response at 18

[173] *See* Stars' MSJ App., Vol. 1 at 106, 191.

[174] *See* Stars' MSJ App., Vol. 1 at 106, 191.

[175] Although the issue was whether the landlord's acquiescence in the tenant's capital improvements estopped the landlord from terminating the lease, the supreme court's reasoning applies equally to whether the Mavericks' acquiescence in the Stars'

### c. *Giller*

[¶ 202]  The Stars' arguments regarding *Giller* are even less availing than their *Shields* arguments.  Like *Shields*, *Giller* addressed whether a landlord's consistent acceptance of late rent payments waived his ability to terminate the lease.  *See Giller*, 644 S.W.2d at 183-84.  And the *Giller* nonwaiver clause was more similar to the one at bar:

> No waiver by the parties hereto of any default or breach of any term, condition, or covenant of this lease shall be deemed to be a waiver of any subsequent default or breach of the same or any other term, condition, or covenant contained herein.

*Giller*, 644 S.W.2d at 184.

[¶ 203]  Based on those terms, the court held that as a matter of law the landlord's acceptance of the tenant's consistently late rent payments did not terminate the landlord's right to terminate the lease for late rent payments.  *Id.*

[¶ 204]  Accordingly, the court concludes that *Giller* does not support the Stars' premise that the COC and Center GP Agreements' nonwaiver clauses are unenforceable.

---

transactions with COC (i) "manifest[s] a clear intent to waive the nonwaiver" clauses or (ii) was "unequivocally inconsistent with claiming a known right [to redeem the Stars' interests]." *See Shields*, 526 S.W.3d at 481, 485. The court concludes that they do not.

### C.    Laches

#### 1.  The Mavericks' Arguments

[¶ 205]  The Mavericks' Affirmative Defenses motion asserts that laches is an equitable defense that does not apply to this breach of contract case.[176]  They relied on *Johns Law Firm, LLC v. Pawlik*, No. 24-20147, 2024 WL 4835239, *5 (5th Cir. Nov. 24, 2024) (citing Texas law); *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998); and *Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412, 415 (Tex. App.—13th Dist. 2001, pet. denied) for that premise.[177]

#### 2.  The Stars' Response

[¶ 206]   The Stars rely heavily on *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964) for the premise that since 1964 the Texas Supreme Court has consistently held that laches applies as a defense to legal and equitable claims.[178]  Next, the Stars argue against *Johns Law* and urge that *Caldwell* supports the Stars.[179]  Finally, the Stars cite *Regent Hotels, Ltd. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 106 (Tex. App.—5th Dist. 1985, no

---

[176] Mavericks' Affirmative Defenses Motion at 4-5.

[177] Mavericks' Affirmative Defenses Motion at 5.

[178] Stars' Affirmative Defenses Motion Response at 10-13 (emphasis in original).

[179] Stars' Affirmative Defenses motion Response at 10-11.

writ); *C.A. Dwyer 1962 Tr. v. Taub*, No. 01-86-00826-CV, 1988 WL 2392, *7 (Tex. App.—1st Dist. Jan.7, 1988, no writ); *Peterson, Goldman, & Villani, Inc. Ancor Holdings, LP*, 584 S.W.3d 556, 568 n.8 (Tex. App.—2nd Dist. 2019, pet. denied); and other cases for the premise that since *Johnson*'s 1964 decision, Texas courts have recognized laches as a potential defense in cases where a party asserts legal or equitable rights.[180]

### 3. The Mavericks' Reply

[¶ 207] The Mavericks' reply relies on *Houston Lighting & Power Co. v. City of Wharton*, 101 S.W.3d 633, 638 (Tex. App.—1st Dist. 2003, pet. denied) for the premise that laches is not available to resist a purely legal right. They further cite *Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, *27 (Tex. App.—2nd Dist. 2022, no pet.) for the argument that laches does not apply to declaratory judgment claims.[181] They then address the Stars' arguments regarding *Caldwell*, *Johnson*, and *Regent Int'l*. Finally, the Mavericks urge that (a) laches does not apply to their tortious interference claim and (b) the Stars "admittedly" did not change their position because of the Mavericks' allegedly unreasonable delay.

---

[180] Stars' Affirmative Defenses Response at 10-13.

[181] Mavericks' Affirmative Defenses Reply at 15.

### 4. Analysis and Decision

#### a. Preface

[¶ 208] The court did not address the parties' laches arguments in part X above because the Stars did not raise laches as an affirmative defense in response to the Mavericks' Declaratory judgment motion.[182] Regardless, the Stars' laches defense fails as a matter of law because they did not adduce evidence that would raise a genuine issue of material fact showing a good faith change in their position to their detriment because of the Mavericks' alleged delay. Moreover, the Stars did not carry their burden, under these circumstances, to raise a genuine issue of material fact that the Mavericks' delay was unreasonable.

#### b. The Mavericks' Declaratory Judgment Motion

[¶ 209] The Mavericks' Declaratory Judgment motion asserts that the Mavericks are entitled to declaratory judgment rulings (i) enforcing the provisions of the COC and Center GP Agreements at issue and (ii) holding that the Stars have no interest in either the COC or Center GP.[183]

---

[182] *See generally*, Stars' Declaratory Judgment Response.

[183] Mavericks' Declaratory Judgment Motion at 29.

[¶ 210] The Stars' response contains several substantive legal arguments as to why declaratory relief should be denied, but they did not raise the laches affirmative defense as a basis for denial.[184] Because the Stars did not comply with Rule 166a(c), laches is not an available ground for opposing the Mavericks' Declaratory Judgment motion. Thus, the court did not consider laches when deciding that motion. *See McConnell v. Southside Ind. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (citing *City of Houston v. Clear Creek Ban Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) (nonmovant must expressly present issues it contends avoids movant's entitlement to summary judgment).

[¶ 211] In *McConnell*, the supreme court held that although Rule 166a(c) can be a rigorous rule, there are several public policy goals for upholding Rule 166a(c)'s requirements that parties state the bases for their motion or opposition. *See* 858 S.W.2d at 341. For starters, having the parties provide adequate information gives all parties notice of matters expected to be argued. *Id.* (citing *Weaver v. Stewart*, 825 S.W.2d 183, 184-85 (Tex. App.—14th Dist. 1992, writ denied)). Second, if courts were to allow exceptions it

---

[184] *See generally* Stars' Declaratory Judgment Response.

would inject uncertainty into summary judgment proceedings concerning what issues were being presented for consideration. 858 S.W.2d at 341. Third, it is not unduly burdensome on the parties. *Id.* Finally, it prevents controversies at the appellate level concerning what issues were actually presented to the trial court. *Id.* at 344.

[¶ 212]  Because the Stars did not satisfy Rule 166a(c)'s requirements, the court need not and does not consider their laches defense to the Mavericks' Declaratory Judgment motion.[185]

[¶ 213]  Regardless, and alternatively, the court grants the Mavericks' Affirmative Defenses motion as applied to the Stars' laches defense.

### c.  Laches Analysis

[¶ 214]  Although the Stars rely heavily on *Johnson* to support their laches defense, for several reasons their response does not meet the standards the supreme court established in that case (and other cases).[186]

---

[185] The supreme court has determined declaratory relief is neither legal nor equitable in nature, but *sui generis*. *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 269 (Tex. 2021). Given laches is generally only available as a defense against equitable claims, it is uncertain whether the Stars' laches defense would even apply to the Mavericks' declaratory judgment motion had it been properly raised. *See Shelley*, 2022 WL 17173526, at *27 (highlighting ongoing dispute concerning applicability of laches to actions seeking declaratory relief).

[186] Because the Mavericks' original and amended petitions sought permanent injunctions, they assert claims seeking equitable remedies. So, in relation to this motion

[¶ 215]  In *Johnson*, the City of Fort Worth sued to enjoin the defendants from using a building as a six-unit apartment house in violation of a city zoning ordinance that limited the property to no more than two family units.  The ordinance became effective in 1953.  In 1958, the city granted a permit to construct a two-family dwelling in the property.  Contrary to the permit, in 1959 the then owner constructed a six-unit apartment house.  Following completion of the building, the city issued a ten-day notice to the owner to discontinue use of all but two units.

[¶ 216]  Sometime later, Johnson acquired the property and then sold it to Hurt in July 1961.  Within a week, the city notified Hurt that she and her tenants were using the property in violation of the zoning ordinance.  In October 1961, the city sued to enjoin Johnson, Hurt, and Hurt's tenants from using the building in violation of the ordinance.  The defendants urged a laches defense (among others).

[¶ 217]  The trial court denied the injunction, and the court of appeals affirmed based on (i) a lack of injury to the city or the residents and (ii) undue delay in bringing the action.  *Johnson*, 388 S.W.2d at 402.  The supreme court

(the Mavericks' Affirmative Defenses MSJ) the court need not address whether laches is an available defense where the claimant seeks only declaratory relief or monetary damages.

rejected both grounds, reversed the judgment, and remanded the case to the trial court with direction to a enter a permanent injunction restraining use of the property in violation of the ordinance. *Id.* at 404.

[¶ 218] As relevant here, the supreme court held that laches is an affirmative defense for which defendants must prove its essential elements. *Id.* at 403. The supreme court then held that:

> The defense of laches is akin to that of estoppel. *Humble Oil & Refining Co. v. Trapp*, Tex.Civ.App., 194 S.W.2d 781, 786, writ refused. Two of the essential elements of laches are (1) unreasonable delay by one having legal or equitable rights in asserting them, and (2) a good faith change of position by another to his detriment because of the delay. *Culver v. Pickens,* 142 Tex. 87, 176 S.W.2d 167, 170-171; 19 Am.Jur. 343, Equity, s 498. The Respondents thus had the burden of proving not only unreasonable delay and lack of diligence by the City of Fort Worth in asserting its right to have the use of the structure brought into compliance with its ordinance, but also that their position *had, in good faith, been changed because of the delay.* They offered no evidence to prove either.

*Id.* (emphasis added).[187]

[¶ 219] Importantly, as applied here, *Johnson* rejected the defendants' laches defense as a matter of law—despite Hurt having paid valid

---

[187] Because *Johnson* involved a single cause of action seeking only a permanent injunction—an equitable remedy—it is not useful guidance regarding whether laches is an available defense where the claimant is asserting legal rights. *Culver v. Pickens*, 176 S.W.2d 167, 170-71 (Tex. 1942), cited by *Johnson*, recognized laches as a defense where the claimants sued for fraud and sought a constructive trust, which is an equitable remedy.

consideration for the property—because she at all relevant times knew the facts regarding the ordinance breach and thus could not be said to have changed her position to her detriment in good faith:

> There is, likewise, an absence of proof in the record that because of the City's delay Mrs. Hurt changed her position in good faith. The deed from Johnson to Mrs. Hurt reflects a valuable consideration, but that fact alone does not import a good faith change of position. Mrs. Hurt was charged in law with knowledge of the City's zoning ordinance and that the structure she purchased was in a 'B' Two-Family District. * * * She did not even prove that she had no actual notice of those facts. She knew that she was purchasing a six-unit apartment house, and she did not prove lack of knowledge that it was erected in violation of the building permit. It simply cannot be said that there is evidence in the record before us that Mrs. Hurt changed her position to her detriment in good faith.

*Id.* at 404 (citations omitted).

[¶ 220] Similarly, the undisputed facts here are that at all relevant times: (i) the Stars knew their Location Commitment's terms, because they signed their franchise agreement containing that commitment; (ii) they knew of the Mavericks' redemption rights if the Stars violated their Location Commitment to Dallas, because they signed the COC and Center GP Agreements giving the Mavericks those rights;[188] and (iii) they knew the

---

[188] Stars' MSJ App., Vol. 1 at 77, 155-56.

nonwaiver clauses gave the Mavericks the right to wait to exercise their redemption rights until it suited their interest to exercise them because the Stars signed contracts containing those clauses.[189]

[¶ 221] Furthermore, as the Mavericks assert,[190] the Stars offered no evidence that they changed their position based on the Mavericks' inaction, meaning there was no detrimental change in position because of the Mavericks' allegedly unreasonable delay.[191] Indeed, the Stars' CEO verified that fact.[192] Like Hurt's paying for the apartment house in *Johnson*, that the Stars fulfilled other contract obligations to COC is not evidence. *See id.*

[¶ 222] Moreover, "[a]s a rule of equity follows the law and generally in the absence of some element of estoppel or something akin thereto, the doctrine of laches will not bar suit short of the period set forth in the limitations statutes." *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 791 (Tex. 1958).

---

[189] Stars' MSJ App., Vol. 1 at 19, 106.

[190] Mavericks' Affirmative Defenses Reply at 18-19.

[191] *See* Stars. MSJ App., Vol. 1 at 7.

[192] Stars' MSJ App., Vol. 1 at 7.

[¶ 223]   Here, the Mavericks sued less than one year after the Stars rejected the Mavericks' redemption letter and the Mavericks' declaratory judgment cause of action accrued.[193]   Additionally, the Stars proffered no evidence of any affirmative act by the Mavericks since, or before, that time that misled the Stars to their detriment.[194]   That is, the Stars offered no evidence that the Mavericks did anything contrary to what they had contract rights to do, including their right to rely on the parties' nonwaiver clauses.

## XII. Disposition

[¶ 224]   For the reasons stated above, the court:

a. Grants the Mavericks' Declaratory Judgment and Affirmative Defenses Motions for Partial Summary Judgment; and

b. Denies the Stars' Amended Standing, Mavericks' Relocation Event, Limitations, Original Impossibility, and Waiver Motions for Partial Summary Judgment;

[¶ 225]   Remaining to be decided are:

a. Whether DSELP is bound by these rulings;

b. All other pending motions not expressly resolved by this Opinion and Order; and

c. Trial on the Mavericks' tortious interference claim and the parties' attorneys' fees claims.

---

[193] *See* part VII above.

[194] *See* Mavericks' Affirmative Defenses Reply at 14-15; Stars' MSJ App., Vol. 1 at 7.

It is so ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  April 2, 2026

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 113215858
Filing Code Description: No Fee Documents
Filing Description: Order Regarding Motion to Strike and Summary Judgment Evidence Objection
Status as of 4/3/2026 8:03 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Laura Lisenbee | | llisenbee@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Chris Bankler | | cbankler@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Pam Collins | | pcollins@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Minoo S.Blaesche | | mblaesche@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Elizabeth Pittman | | epittman@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Theron Bentz | | tbentz@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Gabriela Barake | | gbarake@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Sarah Starr | | sstarr@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Cory Johnson | | cjohnson@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Julie Robertson | | jrobertson@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Ben Hamel | | bhamel@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Andrew Patterson | | apatterson@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Frank Carroll | | focarroll@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Joshua Sandler | | jsandler@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Hugo Acevedo | | hacevedo@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| John David Janicek | | jjanicek@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Lea Ann Del Angel | | ldelangel@jw.com | 4/2/2026 5:35:10 PM | SENT |
| Sarah Balasny | | sbalasny@winstead.com | 4/2/2026 5:35:10 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 4/2/2026 5:35:10 PM | SENT |
| Max Ward | | mward@winstead.com | 4/2/2026 5:35:10 PM | SENT |